**VAUSE et al. v. UNITED STATES.**
No. 411.

Circuit Court of Appeals, Second Circuit.
Aug. 13, 1931.

Blau, Perlman & Polakoff, of New York City (Robert H. Elder, Otho S. Bowling, and Louis Masheb, all of New York City, of counsel), for appellant Vause.

Lind, Shlivek, Marks & Brin, of New York City (George H. Combs, Jr., and Simon Rosenzweig, both of New York City, of counsel), for appellant Schuchman.

George Z. Medalie, U. S. Atty., of New York City (Elbridge Gerry, Livingston Hall, Edmund L. Palmieri, and Arthur H. Schwartz, Asst. U. S. Attys., all of New York City, of counsel), for the United States.

Before MANTON, SWAN, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

The two defendants who have appealed were indicted with eight others. The indictment contained thirteen counts. Each of the first twelve counts charged the fraudulent use of the mails in the same language, but alleged mailing to a different person. The thirteenth count charged conspiracy. Defendant Vause was found guilty on each count. Defendant Schuchman was convicted on the first six and the thirteenth count. Both appealed. Of the other defendants, some pleaded guilty, some were acquitted, and one was convicted but did not appeal.

There is no doubt of the use of the mails, and that feature of the case is not now an issue. The questions involved relate to numerous rulings on the evidence; to refusal to instruct the jury as requested; to the summation of the district attorney who tried the case, and his conduct during the trial; to refusal to grant defendant Vause a continuance and to grant a motion for a mistrial on the ground of the disqualification of a juror.

The scheme to defraud, alleged in the indictment and proved at the trial, consisted in the organization and operation of an investment corporation which solicited and accepted deposits of money in the guise of selling its so-called certificates of indebtedness and its stock. The misrepresentations were in statements that the company was solvent when it was known it was not; that its funds were being used to finance sound business

ventures only after they had been thoroughly investigated, when in fact the defendants knew the money was being risked or squandered in highly speculative ventures, to pay the salaries of the men in control, to pay unearned dividends on the stock, and unearned interest on the certificates of indebtedness; that the corporation was a bank operated in accordance with the banking laws of the state of New York and the supervision of its banking department; that men in control were experienced, competent, and capable—all of which was false as the defendants well knew.

The scheme was carried out as follows: The defendants Schuchman and Vause had had business relations with each other and with some of the other defendants. Schuchman was a trader in securities. Vause was a county judge. One of the other defendants was a private banker on the lower East Side; another was his brother; another the brother of Vause; and the others were useful friends. One of these friends controlled the charter of the Pharmaceutical Finance Corporation which had been organized under the laws of New York in 1925 and was not subject to supervision by the banking department. He contributed this charter. The name of the corporation was changed to Columbia Finance Corporation. Almost enough money was raised and made available to the Columbia Finance Corporation to obtain a place of business at 296 Grand street, New York, and to pay for equipping it so that it had an appearance similar to a bank. This office was opened December 17, 1927. The plan was to sell 7 per cent. stock of the Columbia Corporation and to sell its certificates of indebtedness which bore interest at the rate of 6 per cent. These certificates were printed to look like bonds, and were offered for cash and on an installment plan. When purchased on installments, a book in which payments were entered was given to each purchaser. These books looked like those issued to depositors by banks. They were the product of the brain of Vause. To accommodate purchasers who held such books showing payments made toward the purchase of certificates and who desired to withdraw all or part of their money without causing the Columbia Finance Corporation outwardly, at least, to adopt a practice which would subject it to supervision by the New York banking department, a corporation called Columbia Factors, Inc., was organized with officers from the Columbia Finance Corporation and its place of business in the Columbia establishment. When a book holder wanted money on his book, he would present it at the Columbia office; Columbia Factors, Inc., using Columbia Finance funds, would take up the book, give the holder the money desired, and, if a balance still remained, Columbia Finance Corporation would issue a new book for that amount in the name of the original holder, and that would be delivered to him. Soon large amounts of money came in from numerous people. This was used to maintain the office, pay salaries, and make loans to the insiders, pay interest on the stock and on the certificates, and for investment in highly speculative business which did not turn out well. Columbia Finance Corporation was started without enough money to be solvent when it opened its doors for business and never was solvent and these defendants knew it. It seemed to prosper, however, because it could, and did, continue to take in money from the public for its stock and certificates which were falsely represented in circulars and other matter sent through the mails to be desirable and safe investments.

At the opening of the Grand street office Schuchman introduced Vause as one of those interested in the business and Vause made a speech. Another office was opened in the Bronx, and Vause contributed another speech in which he said that, if he had another $100,000 to invest, he would safely invest it in the corporation. He had not then, nor did he ever, invest a first $100,000, or, in fact, anything in the business. In March, 1928, another office was opened on Seventh avenue in Manhattan and another speech was contributed by Vause.

The Columbia Finance Corporation continued for some time to pay its expenses, its interest charges, and bear its losses out of money received from the sale of its stock and certificates. Vause was not an officer nor did he appear to be interested except as an investor. He was always behind the scenes, however, giving advice, knowing the facts, urging the visible actors on, drawing his salary in the name of his brother, and encouraging the others with the thought that the failure of a business so conducted would amount to nothing but an ordinary commercial bankruptcy from which all would emerge with no other legal entanglement.

When the situation became desperate, a financial adventurer named Montgomery was given the chance to apply his methods. He was well known to Vause, who had been his attorney and interested in some of his ventures. The law firm in which Vause had for-

merly been a partner had unsuccessfully defended Montgomery in a criminal fraud action and he had for a time been a fugitive from justice. Vause, knowing all this, recommended Montgomery to his associates in the Columbia Finance Corporation as a good man to put in charge. Montgomery, of course, found the business hopelessly insolvent. He owned 80 per cent. of the stock in a corporation called the Western Pennsylvania Syndicate, which owned what had been, and could be, represented to be oil and coal bearing land in Pennsylvania. He transferred this stock to the Columbia for $2,000 in cash, and $13,000 of its certificates. This acquisition was then entered on the books of the Columbia as an asset valued at $455,000 without the use of anything but ink to make it that, and in this way the Columbia was made to appear solvent on the books. Schuchman, like Vause, drew a salary from Columbia and helped to do what was being done. He also drew his salary in the name of another. Columbia Finance Corporation did business for exactly two years from the date of the opening of its Grand street office. It was then closed by officials of the state of New York. It then had liabilities of $304,308.41 on its outstanding certificates of indebtedness, had sold stock to the amount of $90,047.50, and had practically no assets.

The history of this financial misadventure has been sketched only in the barest outline, but that will do for present purposes, with such amplification in spots as will be given to show the setting in the general scheme of the particular points raised in this appeal.

 Of the men who were indicted with these defendants, Solomon Cruso, Abraham Rayman, and Joseph P. Barmak pleaded guilty and testified at the trial for the government. Cruso had stepped back to let Montgomery work out his schemes for relief when hope of financial salvation for the Columbia was placed on the efforts and methods of Montgomery. The unsavory reputation of the latter and the thorough knowledge Vause had of it when he urged placing the corporation's affairs in Montgomery's hands did, no doubt, tend to tar Vause and Schuchman somewhat with the same brush in the eyes of the jury. They both objected to evidence showing the kind of a man Montgomery was and Vause now urges especially what is termed error tainting the reception of such evidence. For instance, Rayman testified that he went to see Vause late in September or in October, 1929. He told Vause they had about $60,-000 the week before and about 50,000 people

taking out money, with no money coming in. Vause said to him: "Don't worry, money will still come in. Don't fear anything, nothing will happen, go back." A few days later, when there was $40,000 left, he went to Vause again and reported the situation. Vause then suggested putting a thirty-day withdrawal clause into effect. Rayman reported that to Barmak and Cruso, and it was done. No money came in, expenses continued, and, when the thirty days expired, book holders became insistent, and Rayman again went to Vause, who wanted to know if another thirty-day notice could be required. Upon being told that it could not, he told Rayman: "Don't fear, don't worry, go back to the office and stay like a soldier and fight, there is nothing serious and nothing terrible." Rayman went back and reported, but nothing else was done. A few days later he was sitting in the Seventh avenue office with Cruso when a bail bondsman named Eisenstein came in. Eisenstein had been associated with them and with Vause in another corporation, and when he was told the situation asked what Vause said. Upon being told that Vause advised staying and fighting, Eisenstein said he knew a man who could help out. He then called some one on the telephone and arranged with Rayman and Cruso to meet him, and this person, who was Montgomery, as he then told them, at Young's Restaurant on Broadway that evening. The appointment was kept. Rayman and Cruso were introduced to Montgomery by Eisenstein and told him the facts about Columbia Finance Corporation. Then Rayman was permitted to testify that Montgomery said, "Wait a minute, I am going to call up Barney Vause;" that Montgomery then left the table and in a few minutes came back and said, "All right, boys, I just talked to Barney Vause and everything will be all right, I am going to do something for you that will save you." Eisenstein testified that Montgomery did not call any one on the phone from Young's Restaurant that evening, but that the next day, when Montgomery, Eisenstein, Cruso, Barmak, and Rayman were going over the books at the Seventh avenue office Montgomery did make a call on the telephone and then said to the others, "I just called up Judge Vause and asked Judge Vause what he thought of the proposition," and further that Vause told him he thought it was a good proposition and that he (Montgomery) could make some money out of it. Rayman testified that a few days later he went to see Vause and told him Montgomery

was going into the proposition. Vause told him then that he thought Montgomery could run it all right and could make some money out of it. These conversations concerning the business at hand between men who were engaged in furtherance of the conspiracy charged in the thirteenth count of the indictment and similar conversations, which these defendants now rely upon to show error, between conspirators while so engaged, were clearly admissible against Vause, who had been abundantly shown to be one of the guiding spirits in the venture, and against another of the coconspirators, Schuchman. The bite of such evidence, if it had any, and certainly the basis of the objection to it, lies in its indirect effect in showing that Montgomery was on terms of close intimacy with Vause who did not wish to appear before the jury as a man who would stoop to such a level.

█ Closely akin to this class of exceptions to evidence which put Montgomery, Vause, and Schuchman into the category of co-workers was the evidence that Montgomery was known to be a man who could and would indulge in trickery and fraudulent financial schemes, and was an ex-convict because of his previous practices in that regard. When Montgomery was put upon the stand to testify for the government, the district attorney introduced him to the jury by questions and answers which brought out his real character. His credibility as a witness was an important matter for the jury to decide in order to get at the truth, and there is certainly no point in condemning the district attorney for frankly disclosing at the outset what would enable the jury to do its duty in that regard. The complaint now made rather savors of the thought that he stole a march on these defendants in not letting that phase of the matter wait until they could, if they saw fit, bring out the facts on cross-examination and make the most of their apparent desire to put the witness in his proper place and themselves show that the case against them rested in part on the word of a man of abandoned character. See People v. Minsky, 227 N. Y. 94, 124 N. E. 126.

█ During the direct examination of Eisenstein it appeared that he had borrowed $1,000 of Judge Vause in 1927. He testified that in December, 1929, he had a talk with Vause about this loan, and that Vause then told him the $1,000 was an investment Vause had made in the Spheric Corporation. This company had been organized before the Co-

lumbia Finance Corporation to market Roumanian clay under the name of Spheric Products Corporation and never did any business. It was in connection with its organization that Vause, through Eisenstein, first met Cruso, Rayman, and Schuchman. Nothing further appeared about the $1,000 during the direct examination. But in a lengthy cross-examination the following took place on that subject:

"Q. You told us about a check for $1,000 that was shown to you by Judge Vause and you said that in December of 1927 you borrowed $1,000 of Judge Vause? A. I did.

"Q. You gave him your I. O. U.? A. I did.

"Q. Where is that I. O. U.? A. I haven't got it.

"Q. Did you ever get it back? A. I did not.

"Q. Have you ever paid back this $1,000? A. I did not.

"Q. So that you still owe Judge Vause $1,000? A. I do.

"Q. You have never paid back that $1,000? A. Not yet.

"Q. And you still owe $1,000 to Judge Vause? A. I do.

"Q. You say in December, Judge Vause met you, 1929? A. Yes, he did—I met him.

"Q. And you want to tell this jury that in December of 1929 you told Judge Vause you owed him $1,000 and Judge Vause told you that check for $1,000 was his interest in the Spheric with you? A. There was some conversation.

"Q. Did Judge Vause ask you to pay him back the $1,000? A. Can I explain that?

"Q. If Mr. Tuttle wants explanations he may ask for it; that $1,000 that you got was a loan in December, 1927. A. That's right.

"Q. You were in the Spheric at that time? A. I was.

"Q. Judge Vause was in the Spheric at that time? A. He was.

"Q. And it was after you had put up $2,000 with Cruso and Rayman? A. That's right.

"Q. Now did you offer to pay back this money in 1928, this $1,000? A. I did not.

"Q. Offer to pay it back in 1929? A. I did not.

"Q. Now, in December, 1929, two years after you claim you borrowed $1,000 you met Judge Vause? A. I did.

"Q. Was that after the crash of the Columbia? A. It was.

"Q. You are sure it was December, 1929? A. It was.

"Q. Was it before Christmas of that year? A. It was.

"Q. Was it before the arrest of Cruso? A. After the arrest of Cruso.

"Q. There was no trouble about the Spheric at that time, was there? A. There was not.

"Q. And you say at that time with no trouble except Spheric that Judge Vause said to you that $1,000 that I gave you in December 1927, was my investment in the Spheric, is that right? A. He did.

"Q. And you told him no, it was a loan. A. I said I thought I loaned that $1,000 from you as a personal loan.

"Q. When he told you he invested $1,000 through you in the Spheric you told him, I thought I had borrowed it? A. That's right.

"Q. Did you really give him a paper? A. I believe I gave him an I. O. U. for $1,000.

"Q. Was it a note? A. No.

"Q. Just a piece of paper I. O. U. a $1,000? A. That's all.

"Q. Will you say definitely you gave him a piece of paper showing that you owed him $1,000? A. I did.

"Q. By the way, at the time you had this talk with Judge Vause about the Spheric $1,000, had you been told that Cruso had been arrested? A. Yes.

"Q. Had you been to see Judge Vause about the bailing of Cruso? A. I called up Judge Vause about the bailing of him and he said he had nothing to do with him.

"Q. Was that talk about his having nothing to do with bailing Cruso before he told you that he had given you $1,000 as his investment in the Spheric? A. It was after the talk about bail.

"Q. The talk about the Spheric was after the talk about the bail? A. Yes."

The first question asked this witness on redirect examination was in regard to the testimony elicited on cross-examination and was, with the answer, as follows: "Q. You have been asked about your acquaintanceship with Montgomery and Judge Vause and about their relations to each other; I understood you to say that Judge Vause had acted as counsel for Montgomery? A. I did."

Then he was asked: "Q. In what matters to your knowledge?" This was objected to,

and the district attorney said: "They have gone into the inquiry concerning the relations. I want to show that Judge Vause was acting as counsel in a particular case in which this man put up bail and then I will develop the significance of the check."

The pending question was then withdrawn. Several questions on the subject were asked, objected to, and excluded. Some answers were stricken out, but it was finally made to appear in substance that the witness had furnished bail for Montgomery in the criminal action in which he was defended by Judge Vause's firm and that the bail had been forfeited when Montgomery became a fugitive from justice; that Eisenstein told Vause in December, 1929, that the $1,000 loan was to be applied against what he claimed Vause owed him because of a payment he charged Vause with having received from Montgomery for him (Eisenstein) of the amount of the bail which had been forfeited; that Vause denied that he had received such a payment and insisted that the $1,000 should not be applied on any such thing but should be treated as his investment in Spheric Products. It is true that this matter was not material to the issues on trial except as it tended to show enmity between the witness, and Vause and much ado was made of it. But the responsibility for any harm, if there was any to the defendant concerned, is traceable directly to the cross-examination. The direct examination merely disclosed the loan. That was certainly harmless. The cross-examination led up to the point where the defendant's attorney virtually challenged the district attorney to have the loan explained if he dared. Under these circumstances, the government had to let the matter remain as a subject somewhat veiled in mystery and let it be implied that there was something in it disadvantageous to its case or bring the facts to light. It chose the latter course, and, if it proved to be somewhat of a boomerang to the defendant, there is no help for it now, for the government was not bound to let the defendant bring out only what he pleased and be content itself with no more. Cohen v. United States (C. C. A.) 157 F. 651.

■ When Montgomery was being brought into the affair at the last he talked at length with defendant Vause about Columbia Finance affairs. He testified that he told him (referring to one of the books purchasers of certificates were given): "This thing looks like a pass book, and if these people ever get into difficulties you are going to get stuck." Also, "Barney, I am amazed that you would

have anything to do with that class of people and that kind of people. * * * They are the most terrible looking people I ever saw in my life, and a man in your position ought to be more careful whom you do business with—what class of people from the standpoint, at least of intelligence." Further, "The trouble with you is it is known that I am a convict and it is your fault." And, "As far as I am concerned, I went to jail for you once. I am not going to jail for you again, and as far as these people are concerned, they won't even start to go to jail for you, and the thing for you to do is to get whatever political powers you can and save this thing from going before the Grand Jury. If it does, you will be on trial as sure as you are living." To such statements as these it appeared that Vause replied in effect that everything was all right, and once when he was talking at his chambers with Montgomery and was being reproached because he did not seem to desire to be seen with him told him he would show him what he thought of him, and invited Montgomery to sit on the bench with him while his court was in session. Montgomery accepted and sat with Judge Vause while some prisoners were being sentenced. This kind of evidence did effectively do away with any attempt by the defendant to withdraw from his former associates and figuratively stand apart in robes of white as one who had unwittingly been concerned in what he had the right to believe was an honest enterprise conducted by upright men in a lawful way. It was conversation between two men who were then and there planning and plotting to keep what they both knew was a fraudulent scheme alive by means of further fraud and their conduct and attitude toward each other and the business at hand was material and properly disclosed. It should be kept firmly in mind that evidence not objected to and beyond the shadow of a doubt competent and ample to connect both these defendants with the fraud perpetrated through the Columbia Finance Corporation is contained in the record before us.

To show in part how the funds of the Columbia had been used, it was proved that a loan of $2,500 was made to Vause on a note bearing what purported to be the signature of a Caroline Timm, and that a piece of jewelry was put up as collateral. Vause indorsed the note when he obtained the money in January, 1928. No interest was paid, and Vause continued to have the loan until shortly before Columbia Finance Corporation was closed. Then the jewelry was pawned for $700, and Rayman took the pawn ticket to Vause's chambers, gave it to him, and received a check for $1,800 for the note. At the trial Caroline Timm was produced by the government and sworn as a witness. She was eighty-six years old, and Judge Vause was the trustee of her husband's estate of which she was the beneficiary. She was permitted to testify that she had never signed the note on which Vause got the loan, knew nothing about it, and at one time blurted out, "And he took the money." The court immediately struck this out and then denied a motion for a mistrial. That was all that was necessary to be done. The incident created by an indignant, and very old, lady's comment called for nothing more. What is more serious is permitting any of her testimony. Although Columbia money had been used to make the loan, the transaction was a very minor one perhaps in comparison with the sums involved in the Columbia fiasco, and had no discernible effect on its ultimate closing. But it was one of the things involved in the whole fabric of fraud which it was proper enough to bring out even though to do so cast discredit upon defendant Vause in another direction. In connection with this Timm affair another should be mentioned. It appeared that early in 1928 Vause had been present at a meeting of the directors of the Columbia Finance Corporation and stated that he knew of a few lots in Brooklyn that the city wanted for a school site; that there were two mortgages on the property amounting to $13,000; that it could be purchased for $12,000 above the mortgages; that the city would pay a big price for it; and that he would invest $6,000 himself if the Columbia would put in $6,000. The $6,000 of Columbia money was given to Vause for this purpose, and the Argood Corporation was organized to take, and did take, the title. Later the first mortgage was foreclosed. An agent of Vause attended the sale and bid in the property in the name of a corporation, but the sale was not completed. Another sale was had. The same agent bid in the property for Vause, this time in the name of Sonnenshine. Again the sale was uncompleted. Then Vause bought the first mortgage himself and had it assigned to his brother. Afterwards the second mortgagee foreclosed and purchased the property at the sale. This wiped out the $6,000 investment made by the Columbia, and it appeared that Vause had falsely told Mrs. Timm that he had purchased the first mortgage with funds of the Timm estate. Even if this evidence was not strictly

354

admissible, it is inconceivable that it had any real effect on the outcome of the trial. When so much rain was falling, these few drops must have been thoroughly lost in the deluge.

 Witnesses were permitted to testify. that after the Columbia was closed Vause told them to keep him out of it; not to mention his name; that they told Vause they were shielding him; and that he told them not to talk too much, to keep cool, and not to say anything about him. This is thought to have been erroneously received because the conspiracy had already ended. That is quite beside the point. The evidence was of conversations with a defendant himself who was certainly trying to have the facts concerning himself suppressed, and its admissibility did not depend upon any theory of evidence peculiar to a conspiracy.

 Defendant Vause wanted the Columbia to buy the Bank of the Rockaways. A witness, McMahon, testified that he talked with Vause about it. His testimony in part was: "We looked over the financial statement of the bank and on the way back Judge Vause said to me 'Ed, I want you to get an option on that bank if possible.' He said, 'I have a group who will buy it and we will ask $25,-000.00 for the option.' I discussed with him the $25,000.00 option and he said, 'We will get the money and split it.' Q. Split it in what way? A. Fifty-fifty." This purchase was never made by Columbia. Rayman testified that he talked with Solomon Cruso, Barmak, Schuchman, and a man named Wilson who had investigated the proposition for them. Wilson reported that the price was $25,000 too much, and Schuchman said, "You see Solomon, the Judge wants to pocket $25,-000.00 in this transaction." It is argued that what was said by Wilson in his report was hearsay and so was what the others said. Perhaps so, but, when the record shows by competent evidence that defendant was trying to pad the price the Columbia would have to pay for the bank, no harm can have been done by Rayman's testimony to the effect that the others knew it when they declined to make the purchase.

 When the trial opened, Vause moved for a continuance on the ground of physical and mental ill health. He was examined by two physicians for the government who disagreed with his own. One of them testified: "In my opinion he is physically and mentally able to go to trial if he will co-operate—if he will. What a person will do we cannot anticipate. He can co-operate if he will. He can

go to trial if he will." Another said: "It is my opinion that he can appear here for trial. That is founded on my examination and conversation." His physician was of the opinion that he was not able to co-operate in his defense. Of course, it is well settled that a motion for continuance is addressed to the discretion of the court and its decision reversed only for an abuse of discretion. Isaacs v. United States, 159 U. S. 487, 489, 16 S. Ct. 51, 40 L. Ed. 229; Rachmil v. United States (C. C. A.) 288 F. 782; Clement v. United States (C. C. A.) 149 F. 305. On the evidence, there was no abuse of discretion in refusing to grant the motion for continuance.

 The defendants did not fail in this trial to attempt to pose as innocent victims of a flair for publicity and the political ambition of the district attorney. At the beginning of his summation he called attention to his having been aided by the county district attorney and spoke of the trial as a joint prosecution. Of course, there could have been no such thing technically as a joint prosecution by the government and the state. He continued: "The County District Attorney who has his own indictment—we have joined together to make one trial of it." Then he said: "And while you are trying this case, one of my assistants next door has a prominent Republican on trial for fraud." We do not know what attorneys for the defendants said to the jury, but it is highly probable that these statements were made in answer to insinuations that this prosecution was political. By permitting the argument, the trial court ruled that it was proper, and so it was if made in defense of the good faith of the prosecutor which the defense had questioned. In the absence of any showing that these statements were not made under such circumstances, we should take it that they were, for we cannot now indulge a presumption in favor of error. The presumption is that the ruling of the court was correct until the contrary is made to appear, and without the summation of counsel for the defense this rule of law must control. Murphy v. United States (C. C. A.) 39 F.(2d) 412; Hoffman v. United States (C. C. A.) 20 F.(2d) 328; Christensen v. United States (C. C. A.) 16 F.(2d) 29; Dimmick v. United States (C. C. A.) 135 F. 257, 269.

 This trial began June 17, 1930. On July 11th one of the jurors told an assistant to the district attorney that he had been served with a complaint in an action to close certain premises of which he was the landlord. The

charge was a violation of the National Prohibition Act by a tenant. When the juror called the attention of the assistant to the fact that such a complaint had been served upon him, he stated that he had evicted the tenant and terminated the lease before the complaint was served. This matter was immediately brought to the attention of the court and of counsel for the defendants. The court ruled that the juror was not disqualified. At common law, this would be a question not wholly clear. In Crawford v. United States, 212 U. S. 183, 29 S. Ct. 260, 53 L. Ed. 465, 15 Ann. Cas. 392, the common law was applied and an employee of the government held to be disqualified. The defendants rely largely upon that case. We do not think it in point here, because the New York statute, rather than the common law, controls. 28 USCA § .411 provides: "Jurors to serve in the courts of the United States, in each State respectively, shall have the same qualifications, subject to the provisions hereinafter contained, and be entitled to the same exemptions, as jurors of the highest court of law in such State may have and be entitled to at the time when such jurors for service in the courts of the United States are summoned." Section 424 of the same title relates to peremptory challenges, but section 411 applies to challenges for cause. Southern Pac. Co. v. Rauh (C. C. A.) 49 F. 696, 699; United States v. Reed, Fed. Cas. No. 16,134. See, also, Crawford v. United States, supra, 212 U. S. at page 194, 29 S. Ct. 260, 53 L. Ed. 465, 15 Ann. Cas. 392. The New York Code of Criminal Procedure in section 377 covers the situation before us. It provides that "a challenge for implied bias may be taken for all or any of the following causes, and for no other: * * * 3. Being a party adverse to the defendant in a civil action, or having complained against or been accused by him in a criminal prosecution." Whether this juror would have been prone to curry favor by subservience to the government or been rendered adverse by what seemed to him an unjust complaint or was quite unaffected so far as his duties as a juror were concerned could not be known when the ruling was made. However, it seems clear that, had the complaint against him been served before he had been accepted as a juror and he had been challenged for cause on that ground, the court could, in view of the New York statute, have refused to sustain the challenge without committing error. And so the ruling under consideration was not erroneous.

While Samuel Cruso was on the stand he testified at length concerning defendant Schuchman's intimate connection with the business of the Columbia Finance Corporation, how he directed entries to be made in the books and gave instructions as to the payment of dividends, etc. While his attention was on dividend checks, he was shown a check drawn to the Capital City Corporation and asked if he had seen it before. Following his affirmative reply, he testified that he filled it in at the suggestion of Solomon Cruso. He was then asked:

"Q. Did he tell you what the check was for? A. I think it was some time in the afternoon around two or three o'clock Mr. Schuchman called me up very excited. * * *

"Q. He was then at the State Capitol? A. No, he was arrested, he was calling up from jail."

Testimony followed to show that Schuchman asked for a Columbia Finance Corporation check for $1,000 drawn to the surety company that was to furnish bail for him, and that after his request was complied with it was found that the surety company required cash, so the check was cashed and the money obtained was used to procure the surety for Schuchman. This defendant now complains that the evidence showed that he had been arrested on a charge unknown to this case and unconnected with it. However that may be, he has but himself to blame. It was at his request that funds of the Columbia were used for his benefit rather than for the purposes he and his confederates falsely represented to investors they were being used. This time, the purpose was to get him out of jail rather than investment in sound, well-investigated business, and Schuchman himself was the prime mover in this particular diversion of the money. To be sure, evidence which has little or no bearing on the charge against an accused is not admitted when it shows guilt of an independent crime, Harrison v. United States (C. C. A.) 200 F. 662; nor is evidence of the commission of one crime generally relevant to prove guilt of another, Fish v. United States (C. C. A.) 215 F. 544, L. R. A. 1915A, 809, but evidence which directly tends to prove an issue material in a prosecution is not made inadmissible simply because it indicates in some way that a defendant has been accused of another offense.

It appeared that previous to the organization of the Columbia Finance Corporation, and when Schuchman with offices in New

356

York had been selling securities, he had drafted a sales letter. It was replete with what may be called the overoptimistic statements of one whose real concern is to secure from prospects information as to how much money they have for investment. It was not used in the Columbia business. It was calculated to give the impression that Schuchman was a sound, solid financial expert, but no particular securities were mentioned, and, even though it has no relevancy to the matters in issue, what may perhaps have been technically error in its admission could not have had any effect upon the result. It was otherwise well proved that Schuchman was not conservative in his enthusiasm for marketing securities, and this circular was merely cumulative evidence to the same effect. Compare MacDaniel v. United States (C. C. A.) 294 F. 769.

The district attorney had in his possession statements in writing from various people which the county district attorney's office and the state Attorney General's office had obtained and delivered to him. The defense moved for an order permitting their inspection. The motion was denied. It should be pointed out that what was plainly wanted was an order to turn over private memoranda, but, apart from this, the record shows that the court went into the subject carefully and found that "the only statements that have anything to do with this trial are the ones that have been produced here." There is nothing to show that the court was in error as to this fact, so the defendants had available to them all material statements anyway.

Schuchman excepted to the refusal of the court to charge in accordance with two of his requests which contained in selected language the proposition that, if the Columbia Finance Corporation began without fraud and nothing fraudulent was done until after he had definitely withdrawn from all connection with it, he should be acquitted. This was all well covered in the charge, though not in the precise language requested.

Schuchman was cross-examined relative to testimony he had given in bankruptcy proceedings, and complains of its unfairness generally. The particular question and answer now emphasized was not objected to and we find nothing in the cross-examination which went beyond the limits of the trial court's legitimate discretion. Nor was the cross-examination of this defendant as to testimony he had given in supplemental proceedings circumscribed by section 791 of the

New York Civil Practice Act providing that "an answer cannot be used as evidence against the person so answering in a criminal action or criminal proceeding." The case of People v. Carlson, 222 App. Div. 54, 225 N. Y. S. 149, sets forth the New York rule, and to that extent supports the defendant. But the state could grant no federal immunity or prevent the United States attorney cross-examining the witness as to his former testimony. Jack v. Kansas, 199 U. S. 372, 26 S. Ct. 73, 50 L. Ed. 234, 4 Ann. Cas. 689. Compare, Hale v. Henkel, 201 U. S. 43, 26 S. Ct. 370, 50 L. Ed. 652.

Additional assignments of error were filed after the time for so doing had expired, and a motion was made to include them. While they might well have been disregarded, Vannata v. United States (C. C. A.) 289 F. 424, we have considered all of them, which did not seem wholly trivial, in our search of the record under the practice that errors not assigned may be noticed. Gruher v. United States (C. C. A.) 255 F. 474. The record is convincing that these defendants are guilty as charged, that there is no error which affects the substantial rights of the parties, and that the judgments should not be reversed. 28 USCA § 391. See Hobart v. United States (C. C. A.) 299 F. 784; Savage v. United States (C. C. A.) 295 F. 686.

Both judgments affirmed.