**LANDAY v. UNITED STATES, and four other cases.**
**Nos. 7873–7877.**

Circuit Court of Appeals, Sixth Circuit.
Dec. 14, 1939.

700

Edward N. Barnard, of Detroit, Mich. (William G. Comb, of Detroit, Mich., on the brief), for appellants.

J. Thomas Smith, of Detroit, Mich. (John C. Lehr, of Detroit, Mich., Welly K. Hopkins, William W. Barron, J. Albert Woll, and Wm. J. Connor, all of Washington, D. C., Paul M. Plunkett, of Chicago, Ill., Chester T. Lane, of Washington, D. C., and Paul R. Rowen, of Boston, Mass., on the brief), for appellee.

Before HICKS, ALLEN, and ARANT, Circuit Judges.

ALLEN, Circuit Judge.

Appellants were convicted under a joint indictment which embraced seventeen counts, charging violations of the Mail Fraud Statute and the Securities Act. The first five counts charged violations of Title 18 U.S.C. § 338, 18 U.S.C.A. § 338; the next four counts charged violations of Title 15 U.S.C. § 77q(a) (1), 15 U.S.C.A.·§ 77q(a) (1); the next four counts charged violations of Title 15, § 77q(a) (2); the next three counts charged violations of Title 15, § 77e(a) (1), and the last count charged a conspiracy to violate Title 18, § 338, and Title 15, § 77q(a) (1) and (a) (2).[1]

The court withdrew from the consideration of the jury counts 1, 2, 6, 7, 11, 12, and 13. Appellants were convicted under the remaining ten counts. Landay and Attix were each sentenced to five years imprisonment, Lane to four years, Brown to three years, and Lafata to two years. In addition, each appellant was fined $10,000. The sentence in each case was general.

---

[1] Title 18 U.S.C. § 338, 18 U.S.C.A. § 338. "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises * * * shall, for the purpose of executing such scheme or artifice or attempting so to do, place, or cause to be placed, any letter, postal card, package, writing, circular, pamphlet, or advertisement, whether addressed to any person residing within or outside the United States, in any post office, or station thereof, or street or other letter box of the United States, or authorized depository for mail matter, to be sent or delivered by the post office establishment of the United States, or shall take or receive any such therefrom, whether mailed within or without the United States, or shall knowingly cause to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such letter, postal card, package, writing, circular, pamphlet, or advertisement, shall be fined not more than $1,000, or imprisoned not more than five years, or both."

Title 15 U.S.C. § 77q(a), 15 U.S.C.A. § 77q(a). "It shall be unlawful for any person in the sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

"(1) to employ any device, scheme, or artifice to defraud, or

"(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading * * *."

Title 15 U.S.C. § 77e(a), 15 U.S.C.A. § 77e(a). "Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—

"(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell or offer to buy such security through the use or medium of any prospectus or otherwise * * *."

The gist of the charge was that the appellants devised and executed a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent representations and promises from R. Cummins & Company, Inc., a Michigan corporation formed, dominated and controlled by appellants, the stock of which was intended to be and was sold to the public, including various persons named in the indictment by means of false and fraudulent pretenses, representations and promises. It was charged in substance that the mails were used to send receipts for payments for stock, for delivery of stock certificates to the purchasers, and to send circulars and other information about the company to prospective purchasers of stock in the company, in violation of Title 18 U. S.C. § 338, 18 U.S.C.A. § 338, and Title 15 U.S.C. § 77q, 15 U.S.C.A. § 77q. The same use of the mails was also charged to constitute a violation of Title 15 U.S.C. § 77e, 15 U.S.C.A. § 77e, in that no registration statement was in effect, as provided for by § 77f and required under § 77e. It was an integral part of the scheme that appellants should cause shares of stock of R. Cummins & Company to be issued to themselves without consideration, and should thereby secure for themselves secret profits from the transactions described in the indictment. A motion for directed verdict was made on behalf of appellants, and correctly overruled. The record establishes the following facts by substantial testimony:

Lane, Landay, Brown and Lafata were interested in obtaining the Malta-Vita plant, owned by the Advance-Rumley Corporation, at Battle Creek, Michigan, to use as a distillery. The plant consisted of four buildings some forty years old, situated on four and a half acres of land. A sixty-day option to purchase the plant for $35,000 had been given by the owner to Brown. Jack K. Burns, an architect, had examined the plant and reported that it could be used for distillery purposes. Landay induced Burns to form a partnership with Lane for the purpose of applying for a distillery permit from the Federal Alcohol Control Administration, to be used in operation of the plant. Landay gave as a reason for inducing an outsider to come into the combination that his own name "wouldn't be so good in the public's eye, and Mr. Lafata probably isn't much better than I am."

On October 17, 1933, Landay, Lane, Brown and Lafata executed an agreement with reference to this option, which stated that Brown was acting as trustee for the group, and said it "is the essence of this agreement that when and as if the corporation is formed, that all stock obtained by Leonard E. Brown, Trustee, for any property, cash, services and promotion, shall go into a pool for the benefit of Leonard E. Brown, Frank R. Lane, Sam Lafata and H. H. Landay, who are to share and share alike." It was agreed that all stock, obtained from "various sources" by and for the syndicate, should go into the pool for the benefit of the signers. The agreement specifically covered "transactions, deals or combinations of deals." This written agreement was followed by two written contracts signed by all of the appellants. In the second contract Burns and Attix were also signers, having then been made members of the syndicate. Burns was not a party to the third contract, having at that time withdrawn from the syndicate. These contracts reaffirmed the essential terms that the stock issued in the names of the members of the group should be held in the pool for the benefit of all and should be voted as a block.

Brown then entered into a contract to sell the Malta-Vita plant to the Burns and Lane partnership, which did business as the Old Colonial Distillery Company. The purchase price to be paid was $40,000 and the delivery of 244,791 shares of common stock of one dollar par value of a corporation to be organized. The land was later sold by Advance-Rumley Corporation to Brown as trustee for the syndicate for $35,000. On April 18, 1934, Burns and Lane organized the corporation as the R. Cummins & Company, Inc., with 1,250,000 shares of common stock of one dollar par value. The land contract between Brown and the partnership was assigned to the corporation, which paid $35,000 cash to the Advance-Rumley Corporation, and issued 244,791 shares of its stock to Brown. These shares were held in the pool for the benefit of the group.

Later the corporation issued over 15,000 shares to other members of the group. Burns was given 23,127 additional shares for architectural work performed. All of this stock was turned over to the syndicate.

An application was made to the Michigan Securities Commission on April 18,

1934, for validation of 650,000 shares of the corporation stock for sale. It was represented to the commission at that time that the distillery permit was then being turned over to the corporation, although on its face it was not transferable. At one of the hearings before the commission, Burns was asked whether Brown was interested in the corporation or in the promotion of the group, and he answered no. Landay and Lane were present when this statement was made. Brown represented at a later hearing before the commission that he had nothing to do with the deal; that no part of the stock was to go to Burns or to any one in the group, and that he, Brown, had bought the plant individually.

Offices were opened in Detroit for the purpose of selling the stock, Landay being in charge. Burns, who had been made president of the corporation, sold his interest in the group in September, 1934, and withdrew from the combination entirely, stating that he did not approve of the general conduct of affairs. The sale of stock continued, the mails being used extensively in the delivery of stock, the mailing of circular letters of advertising, and correspondence with customers actual and prospective.

The fraudulent transactions fall into two main classifications:

(1) Issuance of stock to individuals and corporations, which was afterwards turned back to appellants and was resold to the general public. The corporation issued stock as purported compensation to individuals and corporations, large amounts of which were received back into the pool. All of the stock turned back was shown to have been received by one of the appellants. Substantial amounts of the stock are shown to have been resold at approximately two dollars per share, although the Michigan Securities Commission had given permission to sell at one dollar per share. The books of the Cummins Company offered in evidence contain no record of the receipt of any of this stock. The following transactions all fall within the period of the charged conspiracy:

Conrad Keller & Company was awarded a contract for alteration of the Malta-Vita plant. $10,432.26 was charged for the actual work performed. The corporation issued 27,667 shares of stock ostensibly in payment for this work. 26,025 of these shares were endorsed and returned to Landay, but never listed upon the corporate books. In addition, more than $7,500 cash was paid to Conrad Keller & Company by the corporation.

Landay purchased certain used tanks from Mitchell for $1,000, paid by check of the Cummins Company. 6,945 shares of common stock were issued to "L. E. Brown —Agent," as ostensible payment for these tanks.

The Pyne Company contracted to install distillery equipment for the corporation for $15,026. The amount was later reduced by $565. On the journal of the corporation the amount is listed at $18,026.

Thirteen storage tanks were sold to the corporation by the H. J. Heinz Company at a price of $1,037.50. The corporation paid this amount by check. Stock was issued to Brown, as agent, in the amount of 12,610 shares, which included one item of $5,937.50 in payment for these tanks.

Matt Corcoran, a coppersmith of Louisville, contracted to install stills in the plant for some $49,000. Landay and Attix suggested that Corcoran raise the contract price to $53,000, and issued 4,000 shares of stock to him for which Corcoran gave no service and no consideration. He immediately endorsed the stock and returned it to Landay.

The Kelsey-Hayes Wheel Company negotiated with Landay for the sale of a boiler plant for $6,500. Landay had the bill of sale made out to the Majestic Engineering Company, which was an assumed name for one of Landay's agents. The corporation approved the purchase of this plant for $31,000 a week before the plant was bought from the Kelsey-Hayes Wheel Company. 31,945 shares of stock were issued in payment to the Majestic Engineering Company. This stock was sold and transferred to numerous purchasers upon orders signed by Brown and Lane.

Advance-Rumley Corporation gave Brown an option in July, 1935, to purchase several acres of land and two buildings next to the Malta-Vita plant for $35,000. The option was assigned to Oestreicher, an agent of the syndicate, who entered into a land contract with Advance-Rumley Corporation. Attix, attorney for the corporation and then one of its directors, witnessed Oestreicher's signature to the land contract. Oestreicher sold the property to the corporation for $149,500 and received 149,500 shares of stock therefor.

(2) The second of the classifications consisted of misrepresentations as to the business and assets of the company.

It was represented that R. Cummins & Company was a distillery corporation organized in 1860, whose plant in Kentucky had been destroyed by fire so that it was locating on a new site in Battle Creek, Michigan, whereas it was a newly organized Michigan corporation. It was stated in circulars that the corporation owned a fine modern well-equipped plant at Battle Creek, in which the manufacture of whiskey was to be begun almost immediately, whereas all that the corporation owned at the time was a land contract and the buildings were old and not equipped. It was represented on June 7, 1935, that the plant was composed of nine buildings and eleven and a half acres of land. At that time the corporation had a land contract only for the Malta-Vita plant, consisting of four buildings and four and a half acres of land. Brown later secured an option upon additional land and buildings, but they were not purchased until May 4, 1936. It was also represented that the stock was original issue stock, the proceeds of which would be placed in the treasury. Seven witnesses testified that they purchased stock in 1935 which was reissued stock. This representation alone, when made through the medium of the mails, has been held sufficient to sustain a conviction under Title 18 U.S.C., § 338, 18 U.S.C.A. § 338. Myers v. United States, 2 Cir., 223 F. 919, 925.

All of the above facts were proven by convincing evidence, the evidence sustaining the indictment both as to the counts under the Mail Fraud Statute and the Securities Act. The existence of a conspiracy to use R. Cummins & Company for a secret profit as early as October, 1933, was clearly established. Since a conspiracy existed, the acts, statements and representations of each conspirator in furtherance of a common criminal enterprise were in law the acts, statements and representations of all. Bogy v. United States, 6 Cir., 96 F.2d 734.

Many legal questions have been raised by appellants as ground for reversal of the judgments. All assignments of error have been considered, but we shall discuss only the most important.

The denial of the motion for a bill of particulars in no way prejudiced appellants. It asked, among other things, for a "statement as to the written and printed circulars, bulletins, letters and notices, stockholders reports, newspaper advertisements, and any and all other written or printed literature other than those specifically attached to and made a part of the various counts of the indictment." The indictment, which covered fifty pages, was extremely detailed, and fairly apprised appellants of the charges against them. The request for the bill was sweeping, and if granted, would have forced the Government to reveal its evidence in advance of the trial. This is not the function of a bill of particulars. Mulloney v. United States, 1 Cir., 79 F.2d 566; Robinson v. United States, 9 Cir., 33 F.2d 238, 240; Stumbo v. United States, 6 Cir., 90 F.2d 828. Nothing in the record indicates that appellants were surprised or prejudiced by the denial. The matter lies peculiarly within the discretion of the trial court (Wong Tai v. United States, 273 U.S. 77, 82, 47 S.Ct. 300, 71 L. Ed. 545; Stumbo v. United States, supra), and no abuse of discretion is shown.

Appellants moved to quash counts 14, 15 and 16 of the indictment, which charged failure to file with the Securities Exchange Commission the registration statement required by Title 15, § 77e, which is a prerequisite in the use of the mails. We note that no possible prejudice could have resulted to appellants from the overruling of the motion to quash these counts, as appellants were found guilty on ten counts, any one of which, with the exception of the last count, was sufficient to warrant the sentences. Bartholomew v. United States, 6 Cir., 177 F. 902. The evidence under counts 14, 15 and 16 was admissible under other counts, and the result, so far as the appellants were concerned, was as if a verdict of guilty had not been rendered. There is nothing, therefore, of which they can complain in the overruling of the motion to quash these counts.

Regardless of this consideration, we think that the court properly overruled the motion, which was based upon the ground that the appellants are not issuers under Title 15, § 77b(4), and that the counts therefore did not charge an offense.

§ 77b(4) defines the term "issuer" as "every person who issues or proposes to issue any security; * * * except that in the case of an unincorporated association which provides by its articles for limited liability of any or all of its members, or in the case of a trust, committee, or other legal entity, the trustees or members thereof

shall not be individually liable as issuers of any security issued by the association, trust, committee, or other legal entity * * *."

■ This section must be read in conjunction with § 77d, which provides that § 77e shall not apply to transactions "by any person·other than an issuer." It is in brief the contention of the appellants that since the indictment charges that the appellants caused the Cummins Company to issue the stock, the Cummins Company was the issuer, and appellants fell within the exception of § 77d.

■ The argument advanced is that the term "other legal entity" includes a corporation, which is a form of legal entity. Squarely opposed to this view is the fact that the exception applies to legal entities which have "members;" but corporations do not have members. It is uncertain whether Congress meant, in speaking of legal entity, to include corporations, or meant by use of the term "member" to speak only of those legal entities which have members, such as partnerships. Cf. Mills v. J. H. Fisher & Co., 6 Cir., 159 F. 897, 899, 16 L.R.A.,N.S., 656. The provision is ambiguous, and therefore we look to the contemporary legislative history of the act to illuminate its purpose. The conference report on the Securities Exchange Act of 1934, H.R. No. 1838, 73d Congress, 2d Session, discussing the amendment of § 77b (4) of the Securities Act, declared:

"The amendments to section 2(4) [Sec. 77b(4), Title 15, U.S.C., 15 U.S.C.A. § 77b (4)] * * * provide that the liability of an issuer shall not attach individually to the trustee or members of a trust or committee. The basis for the application of absolute liability under Section 11 to the issuer of securities is the principle that one should not retain the fruits of an unfair bargain. In the case of a trust or committee it is the trust or committee rather than the trustees or members, which profits from the bargain. Consequently the latter should not have the issuer's liability. The amendment reaches the result attained by the Commission's interpretation that the trusts and committees, recognized as entities by section 2(2) [77b(2)], are themselves the issuers of their securities."

■ This report plainly indicates that § 77b(4) was never intended to apply to corporations. Corporations are not named in the exception, nor do they fall within the class of legal entities described in the exception. Appellants, therefore, who are clearly shown to have caused the issuance of this stock, fell within the sweeping provision of the first clause, which applies the penalty of the statute to "every person who issues or proposes to issue any security." As appellants by voting their shares of stock in a block completely dominated the corporation, the acts of the corporation were their individual acts (McCandless, Receiver v. Furlaud, 296 U.S. 140, 165, 56 S.Ct. 41, 80 L.Ed. 121), and they are issuers within the meaning of the statute.

■ The books of various corporations introduced in evidence presented relevant facts and were sufficiently identified. They presented evidence of the transactions with Conrad Keller & Company, Pyne Company, and Kelsey-Hayes Wheel Company, and showed that R. Cummins & Company never received the stock turned back to the pool. The records were voluminous, and made in the regular course of business, and while the entrants were not called to testify, the entries were prepared in the ordinary routine, which warrants their reliability. The burden of producing the entrants would have unreasonably prolonged a trial already unreasonable in its length. The proof satisfied the test laid down by this court in Johnson v. United States, 6 Cir., 89 F.2d 913. The various exhibits were the first permanent records, identified by the one who superintended the making of the records. In accord with this decision are the following cases, which show that the common law rule with reference to the necessity of producing the individual entrant and proving his personal knowledge of the entry has been relaxed: Massachusetts Bonding & Ins. Co. v. Norwich Pharmacal Co., 2 Cir., 18 F.2d 934, 937; St. Paul Fire & Marine Ins. Co. v. American Food Products Co., 8 Cir., 21 F.2d 733, 737; McNeil v. United States, 66 App.D.C. 199, 85 F.2d 698; Jennings v. United States, 5 Cir., 73 F.2d 470; O'Shea v. United States, 6 Cir., 93 F.2d 169; Capozzi v. United States, 3 Cir., 90 F.2d 921; Jarvis v. United States, 1 Cir., 90 F.2d 243; Cub Fork Coal Co. v. Fairmont Glass Co., 7 Cir., 19 F.2d 273, 275; United States v. Becker, 2 Cir., 62 F.2d 1007, 1010; Capone v. United States, 7· Cir., 51 F.2d 609, 619, 76 A.L.R. 1534; E. I. Du Pont de Nemours & Co. v. Tomlinson, 4 Cir., 296 F. 634, 639; United States v. Cotter, 2 Cir., 60 F.2d 689, 693.

Also, since the indictment was returned March 20, 1937, Title 28 U.S.C. § 695, 28 U.

S.C.A. § 695, enacted June 20, 1936, applies. The statute provides that "In any court of the United States * * * any writing or record * * * made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of said act, transaction, occurrence, or event, if it shall appear that it was made in the regular course of any business, and that it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter. All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but they shall not affect its admissibility. * * *" Under this statute the business records objected to were properly received in evidence.

Appellants urge that this statute does not apply here because all records in question were made prior to its effective date, and the statute itself (Title 28, §.695h) provides that "Sections 695 to 695h of this title shall be prospective only, and not retroactive." In support of this contention appellants cite Greenbaum v. United States, 9 Cir., 98 F.2d 574, which held that the statute did not apply to cases where the indictment had been returned prior to the effective date of the act. In the instant case, however, the statute was in effect when the indictment was returned. In Valli v. United States, 1 Cir., 94 F.2d 687, the date of the indictment does not appear, but the opinion declares that § 695 was passed subsequent to the records of the sales and deliveries sought to be introduced, and that under § 695h they were inadmissible.

Section 695h does not state whether it merely prohibits the application of the statute to pending cases, or to records made prior to the effective date of the act. It was inserted by the Senate, and the legislative history of the enactment sheds no light upon the particular meaning of § 695h. However, it is the general rule that when there is no direct constitutional prohibition, Congress or a state legislature may pass retrospective laws such as in their operation may affect pending suits and give to a party a remedy which he did not previously possess, or modify an existing remedy or remove an impediment in the way of legal proceedings. Freeborn v. Smith, 2 Wall. 160, 174, 17 L.Ed. 922. If the statute authorizes conviction upon proof less in amount or degree than when the offense was committed, it is ex post facto, and unconstitutional. But where the change affects the means of proof or rules of evidence only, it is valid if the changes are reasonable and do not disturb vested rights. Such statutes are constitutional even in their application to pending suits. § 695 changes the rule as to admission of evidence but does not lessen the amount or the degree of proof necessary to conviction. Hence within the decisions of the Supreme Court it would have been valid even if retrospectively applied to pending suits. Hopt v. Utah, 110 U.S. 574, 589, 4 S.Ct. 202, 28 L.Ed. 262; Thompson v. Missouri, 171 U.S. 380, 387, 18 S.Ct. 922, 43 L.Ed. 204. Cf. People v. Qualey, 210 N.Y. 202, 104 N.E. 138, Ann.Cas.1916A, 1108; Houle v. Lussier, 50 R.I. 339, 147 A. 756.

The question whether a statute is retroactive, has been considered in general from the standpoint of its applicability to a pending case. Since § 695 et seq., related to rules of evidence, within the rule of Thompson v. Missouri, supra, it would apply to pending cases unless the Congress specifically declared otherwise. We conclude that when the Congress enacted § 695h, it intended merely that the statute should not apply to pending cases.

The nature of the statute and its purpose demonstrate that § 695h was not intended to shut out records which had been made prior to the enactment of the statute. This statute is remedial, intended to remedy the difficulty of securing evidence owing to the absence, death, or nonavailability of those who personally make up business records, and owing also to the use of mechanical devices and subdivision of records under modern corporate accounting methods, which make it impossible to comply with the common law rule. H.R. 2357. The statute does not purport to affect the making of records, but only their admissibility in evidence. To hold that it applies only to records made after the effective date of the act in many cases would completely nullify the purpose of the statute. Moreover, the provision as to retroactivity relates to nine preceding sections. In general these sections cover rules for the admission in evidence of writings and records made in the general course of business, but they also include other provisions, such as the manner of taking testimony before a consular officer (§ 695c), the fees of consuls and witnesses (§ 695f). As to these sections the

provision that the enactment shall not be retroactive cannot relate to the time of making a record, that is, creating the evidence. It must relate to the time that the case was instituted in which the evidence is sought to be produced for this is the only construction as to retroactivity which sensibly and uniformly applies to all of the preceding sections.

As stated in Hass v. United States, 8 Cir., 93 F.2d 427, 437:

"The provision of the act which prevents a retroactive application did not make the act inapplicable at the time this case was tried. No one has a vested right in any existing rule of evidence. Congress and the Legislatures of the states may modify and control rules of evidence and may apply new rules to pending causes of action, provided a party is not deprived of his right to present his proof."

We conclude that the statute applies, and that the books and records objected to fall within its purview.

It is contended that frequent misconduct on the part of the Government's attorneys prevented a fair trial. The alleged misconduct could not have affected the conclusion, for the evidence overwhelmingly established the guilt of the appellants. The combination of the written agreements between the members of the syndicate, their deliberate falsification before the Michigan Securities Commission, and the numerous instances of fraudulent manipulation of accounts with contractors and others, as hereinbefore set forth, and the sale of the stock so received by virtue of letters and circulars sent through the mails, presents an extremely convincing case of violation of the Securities and Mail Fraud statutes. Under such circumstances, the misconduct of Government counsel could have no effect upon the verdict. Robbins v. United States, 9 Cir., 229 F. 987, 988; Myers v. United States, supra. Every alleged impropriety of counsel here complained of was promptly rebuked by the District Court, and the jury was instructed to disregard it. It is presumed that the jury followed the court's instruction. Parmagini v. United States, 9 Cir., 42 F.2d 721. The obviously retaliatory statements of counsel for the Government in closing argument is not shown to be improper where the record does not present the statement of counsel for appellants. Vause v. United States, 2 Cir., 53 F.2d 346, 354; United States v. Dilliard, 2 Cir., 101 F.2d

829, 837. Counsel's request to the jury that they find the appellants guilty as charged is not cause for reversal. Nichamin v. United States, 6 Cir., 263 F. 880, 882; Tuckerman v. United States, 6 Cir., 291 F. 958, 969.

It is also contended that certain remarks of the court were prejudicial. In one instance the court commented upon the testimony of the witness, saying that he "has a way of saying things that convinces you." At another time, in trying to speed up the trial and avoid irrelevant detail in the examination of a witness, the court said: "I have taken charge of this case. We will get through before Christmas or I will know why." No exception was taken to either of these statements. The trial lasted eleven weeks, and involved the five appellants and two other defendants one of whom was found not guilty by direction of the court, and the other was dismissed. It is not surprising that certain statements of the court, divorced from their context, can be twisted by counsel to appear in other than their true light. None of the statements objected to, when read in their context, are prejudicially erroneous.

The appellants did not take the stand. Extreme latitude was permitted by the court in admitting testimony in their favor, and the trial was fair.

Neither does prejudicial error exist in the admission or exclusion of evidence. The court rightly excluded testimony as to the value of the property acquired under the various options and contracts. The gist of the indictment was not that appellants had defrauded the corporation through their purchase of worthless property; it was that the appellants had conspired together fraudulently to make a secret profit from the manipulation of the corporate business, to the detriment of the stockholders. Hence the evidence as to value proffered on behalf of the appellants was immaterial.

Appellants as promoters of R. Cummins & Company occupied a fiduciary relationship to the corporation and to purchasers of its stock, and were under an obligation to give the corporation the benefit of their independent judgment in regard to the value of property to be purchased and the price to be paid, as well as its fitness for the intended use. The benefit of the purchases by Brown, Oestreicher, and others, inured to the company. Appellants

are not permitted to make a secret profit on the sale of property to the corporation, particularly when they are officers and directors and assume to act in behalf of the corporation, as was the case here. Yeiser v. U. S. Board & Paper Co., 6 Cir., 107 F. 340, 348, 349, 52 L.R.A. 724; McCandless, Receiver v. Furlaud, supra.

We find no reversible error in the record, and the judgment as to each appellant is affirmed.