## LILLY et al. v. HAMILTON BANK OF NEW YORK.

(Circuit Court of Appeals, Third Circuit. December 6, 1909.)

### No. 50.

1. BANKS AND BANKING (§ 116*)—REPRESENTATION OF BANK BY OFFICERS—FRAUD—NOTICE.

   Where the payees of a note fraudulently acquired offered it to a bank of which they were directors and members of the discount committee, but withdrew from the meeting of the committee, and took no part in the committee's determination of the advisability to purchase, and did not disclose any facts which would have led to the discovery of the fraud, the payees' knowledge thereof was not imputed to the bank because of their relation to it, under the rule that the law will not impute notice from an agent to his principal where such notice would necessarily prevent the consummation of the transaction in which the agent was engaged.

   [Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 286, 287; Dec. Dig. § 116.*]

2. WITNESSES (§ 349*)—CROSS-EXAMINATION—SCOPE.

   In an action on a note alleged to have been obtained from the makers by fraud and transferred to plaintiff bank before maturity, a question asked of one of the defendants on cross-examination, whether after he began to suspect the payees' fraud he made any effort to recover possession of the note, was properly allowed to show whether the witness' conduct was consistent with his declaration that he suspected fraud.

   [Ed. Note.—For other cases, see Witnesses, Dec. Dig. § 349.*]

3. BILLS AND NOTES (§ 505*)—TRANSFER—FRAUD—EVIDENCE.

   In an action on a note alleged to have been obtained by fraud as the purchase price of certain stock and transferred to plaintiff bank before maturity, the court properly refused to permit defendants to prove that the payees did not have the stock which they agreed to deliver in their "strong box" in the bank, as they had stated, but that they had hypothecated the stock, and did not have possession or control of it.

   [Ed. Note.—For other cases, see Bills and Notes, Dec. Dig. § 505.*]

4. BILLS AND NOTES (§ 505*)—FRAUD—TRANSFER—EVIDENCE.

   In an action on a note given for the purchase price of certain stock and transferred to plaintiff bank, the court properly refused to allow defend-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ants to prove the terms of a certain trust alleged to have been created by the payees for the benefit of their creditors, including plaintiff, as such trust if created would not relieve defendants from liability.

[Ed. Note.—For other cases, see Bills and Notes, Dec. Dig. § 505.*]

5. WITNESSES (§ 37*)—COMPETENCY—MEANS OF KNOWLEDGE OF FACTS.

Where in a suit on a note alleged to have been procured by fraud and transferred to plaintiff bank, the bank claimed to have purchased the note for $48,861.11, and placed that sum to the credit of T., one of the transferrors, on its books, evidence that certain checks drawn by T. against his account in the bank, amounting to $50,500, had been paid by the bank, was admissible, though the witness testified from his knowledge of the course of business and from the signatures, indorsements, and stampings on the check, and not from actual knowledge or recollection of the papers.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. § 81; Dec. Dig. § 37.*]

6. APPEAL AND ERROR (§ 856*)—RULINGS—EVIDENCE—REVIEW.

A ruling on the admission of evidence will not be reversed for a different reason than that assigned in the trial court to sustain the objection.

[Ed. Note.—For other cases, see Appeal and Error, Dec. Dig. § 856.*]

7. EVIDENCE (§ 222*)—ADMISSIONS BY COPARTY.

In an action by a bank on a note given for the purchase price of certain stock, evidence that during the negotiations, prior to the signing of the contract for the sale of the stock, defendant C. admitted the interest of the other defendants in the contract, was competent.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 797–808; Dec. Dig. § 222.*]

8. BILLS AND NOTES (§ 467*)—INDORSEMENT—ACTION—PLEADING.

Plaintiff, who holds a note indorsed in blank, may declare on it as a note indorsed and delivered to plaintiff by the indorser, regardless of the number of hands through which it may have passed after such indorsement, or by the person from whom it had been actually received.

[Ed. Note.—For other cases, see Bills and Notes, Dec. Dig. § 467.*]

In Error to the Circuit Court of the United States for the Eastern District of Pennsylvania.

Action by Hamilton Bank of New York against James C. Lilly and others. Judgment for plaintiff, and defendants bring error. Affirmed.

John K. Andre, for plaintiffs in error.

Thomas Earle White, James M. Gifford, and Anson M. Beard, for defendant in error.

Before GRAY, BUFFINGTON, and LANNING, Circuit Judges.

LANNING, Circuit Judge. The Hamilton Bank of New York City, the plaintiff below, recovered a judgment against the defendants below, the plaintiffs in error here, on a promissory note for the sum of $50,000. The bank purchased the note before maturity from E. R. Thomas and O. F. Thomas, the former of whom was president, and both of whom were directors and members of the discount committee, of the bank. One of the questions presented by the assignments of error relates to what the defendants insist was a fraud perpetrated by the Thomases upon the defendants, who were makers of the note. The essential facts as to this branch of the case are these: On October 5, 1907, the Thomases and John J. Coyle entered into a written

contract by which the Thomases agreed to sell and deliver to Coyle certain stocks and bonds, and Coyle agreed to pay to the Thomases, as part of the consideration therefor, the sum of $100,000 in cash, and to redeliver to the Thomases the bonds and a portion of the stock as collateral to secure the payment of the residue of the consideration money. The contract was signed on Saturday afternoon after the banks had closed, and it was then orally agreed, so the defendants contend, that in lieu of the payment of $100,000 in cash Coyle should deliver to the Thomases a certificate of deposit for $50,000 and the note now sued on for $50,000, on condition that the Thomases should use neither the certificate of deposit nor the note before delivering to Coyle 1,056 shares of the stock of the Provident Savings Life Assurance Society, which it was understood should be done on the following Monday. The stock, except 39 shares, was never delivered to Coyle. Notwithstanding this fact, on October 16, 1907, at a meeting of the Hamilton Bank's discount committee, E. R. Thomas offered the note to the bank. The discount committee was composed of five members, who were Mr. Sullivan, its chairman, Mr. Martin, Mr. Reisenberg, and the two Thomases. Mr. Ives, vice president of the bank, was the discount committee's secretary. Mr. Martin had died before the date of the trial. Mr. O. F. Thomas was not called as a witness by either side. Of the other four persons present, Messrs. Sullivan, Reisenberg, and Ives testified for the plaintiff to the effect that, when E. R. Thomas offered the note to the bank, he stated to the committee that he had received it in part consideration for the sale of his interest in the Provident Savings Life Assurance Society, and that its makers were men of large wealth; that Sullivan, Reisenberg, and Martin then considered the offer, the two Thomases taking no part in the conference and not being present at it; that at the close of the conference the Thomases were called to the other members of the committee, and informed that the bank would purchase the note provided the Thomases would guarantee its payment; that the Thomases agreed to guarantee its payment; that the other three members then voted to accept the note; that the Thomases did not vote on the question, or take any part in deciding whether the bank should accept the note; that Mr. Ives prepared the guaranty, which was signed by the Thomases, and that the note was thereupon purchased by the bank for the sum of $48,861.11, and that sum placed to the credit of E. R. Thomas on the books of the bank. Mr. E. R. Thomas, who testified for the defendants, also repeatedly declared that he took no part in deciding whether the bank should purchase the note. The minute of the proceedings of the discount committee is as follows:

"Mr. E. R. Thomas offered a note for $50,000 made by a number of wealthy men in Phila., which he and his associates had received in the matter of the sale of the Provident Savings Life Insurance Company, and, after some discussion, it was voted to accept the note, provided Messrs. E. R. and O. F. Thomas guarantee same."

The authority of the discount committee to accept paper for the bank was conferred by the following by-law of the bank:

"That two local directors be added to the discount committee, and that all loans of $5,000 and over, not passed on by the board of directors, be referred

to this committee, and receive the unanimous consent of all members present at the meeting before being entered."

The argument of the defendants is that the Thomases perpetrated a fraud on the defendants by the sale of the note to the bank, that they must be considered as having joined in the unanimity required by the by-law for the acceptance of the note, and that, being so considered, their knowledge of the alleged fraud is imputable to the bank.

In submitting the question of fraud to the jury the trial court charged, in substance, that, if they should find that the Thomases disposed of the note to the bank in fraud of the rights of the defendants, the law would not impute to the bank knowledge of that fraud merely because one of the Thomases was the president, and both of them were directors and members of the discount committee, of the bank.

It is a general rule of the law of agency that a principal is bound by the knowledge of his agent. In the case of The Distilled Spirits, 11 Wall. 367 (20 L. Ed. 167), Mr. Justice Bradley said that the rule "is based on the principle of law that it is the agent's duty to communicate to his principal the knowledge which he has respecting the subject-matter of negotiation, and the presumption that he will perform that duty." That the rule has certain exceptions was conceded by Justice Bradley. He said, for example, that when it would be unlawful for an agent to communicate his knowledge to his principal, as when it has been acquired confidentially as attorney for a former client in a prior transaction, the reason of the rule ceases, and his principal ought not to be bound by the agent's secret and confidential information. That case did not call for any expression of opinion as to whether there is not also another exception, when the agent is engaged in committing an independent fraudulent act for his own benefit. On principle it seems it should be so. If the reason of the general rule is that the law presumes the agent has discharged his duty of communicating his knowledge to his principal, there seems to be no just ground for denying the second exception above suggested, for it cannot be fairly presumed that an agent will communicate to his principal a fraud intended for his own and not his principal's benefit. Another reason for the general rule has been stated, however, and that is that where one in transacting the business of his principal is committing a fraud for his own benefit he is not acting within the scope of his authority as his principal's agent, and therefore that his knowledge of the fraud is not imputable to his principal. Speaking of the general rule that the principal is held to know all that his agent knows in any transaction in which the agent acts for him, the Circuit Court of Appeals for the Sixth Circuit, in Thomson-Houston Electric Co. v. Capitol Electric Co., 65 Fed. 343, 12 C. C. A. 645, said:

"This rule is said to be based on the principle of law that it is the agent's duty to communicate to his principal the knowledge which he has respecting the subject-matter of negotiation, and the presumption that he will perform that duty. Such a presumption cannot be indulged, however, where the facts to be communicated by the agent to the principal would convict the agent of an attempt to deceive and defraud his principal. The truth is that, where an agent, though ostensibly acting in the business of the principal, is really committing a fraud for his own benefit, he is acting outside the scope of his

agency, and it would therefore be most unjust to charge the principal with knowledge of it."

Such was also the view expressed by the Circuit Court of Appeals for the Eighth Circuit in Bank of Overton v. Thompson, 118 Fed. 798, 56 C. C. A. 554. And in Allen v. South Boston R. Co., 150 Mass. 200, 22 N. E. 917, 5 L. R. A. 716, 15 Am. St. Rep. 185, it was said:

"The general rule is that notice to an agent, while acting for his principal, of facts affecting the character of the transaction, is constructive notice to the principal. * * * There is an exception to this rule when the agent is engaged in committing an independent fraudulent act on his own account, and the facts to be imputed relate to this fraudulent act. It is sometimes said that it cannot be presumed that an agent will communicate to his principal acts of fraud which he has committed on his own account in transacting the business of the principal, and that the doctrine of imputed knowledge rests upon a presumption that an agent will communicate to his principal whatever he knows concerning the business he is engaged in transacting as agent. It may be doubted whether the rule and the exception rest on any such reasons. It has been suggested that the true reason for the exception is that an independent fraud committed by an agent on his own account is beyond the scope of his employment, and therefore knowledge of it, as matter of law, cannot be imputed to the principal, and the principal cannot be held responsible for it. On this view, such fraud bears some analogy to a tort willfully committed by a servant for his own purpose, and not as a means of performing the business intrusted to him by his master. Whatever the reason may be, the exception is well established."

In 2 Pomeroy's Eq. Jur. (3d Ed.) § 675, it is said:

"It is now settled by a series of decisions possessing the highest authority that when an agent or attorney has, in the course of his employment, been guilty of an actual fraud contrived and carried out for his own benefit, by which he intended to defraud his own principal or client, as well as perhaps the other party, and the very perpetration of such fraud involved the necessity of his concealing the facts from his own client, then under such circumstances the principal is not charged with constructive notice of facts known by the attorney and thus fraudulently concealed."

This language of Professor Pomeroy was quoted by Mr. Justice Harlan in American Surety Company v. Pauly, 170 U. S. 133, 18 Sup. Ct. 552, 42 L. Ed. 977, which case also clearly sustains the doctrine that the law will not impute notice from an agent to his principal where such a notice would necessarily prevent the consummation of the agent's fraudulent scheme. To the same effect are Gunster v. Scranton Illuminating, Heat & Power Co., 181 Pa. 327, 37 Atl. 550, 59 Am. St. Rep. 650; Graham v. Orange County Nat. Bank, 59 N. J. Law, 225, 35 Atl. 1053; M. L. Ins. Co. v. F. S. S. & G. S. F. R. R. Co., 139 N. Y. 146, 34 N. E. 776; Bank of N. Y. N. B. Ass'n v. A. D. & T. Co., 143 N. Y. 559, 38 N. E. 713; Henry v. Allen, 151 N. Y. 1, 45 N. E. 355, 36 L. R. A. 658; Benedict v. Arnoux, 154 N. Y. 715, 49 N. E. 326.

There are cases which hold that knowledge of the illegality of a note by a bank director, acting with the board or committee of the bank at the time of the purchase or discount of the note by the bank, is imputable to the bank, while such knowledge by a director who is not present and does not act with the board or committee when the note is purchased or discounted is not imputable to the bank. National

Bank v. Norton, 1 Hill (N. Y.) 572; Bank of United States v. Davis, 2 Hill (N. Y.) 452; North River Bank v. Aymar, 3 Hill (N. Y.) 262; President, etc., v. Cornen, 37 N. Y. 320, 93 Am. Dec. 573; Atlantic State Bank v. Savery, 82 N. Y. 292. We think, however, that, if the distinction is sound at all, it has no application where the director is transacting business with his bank for himself, and in its transaction fraudulently conceals facts which if made known to the bank would defeat his purpose. In Terrell v. Branch Bank of Mobile, 12 Ala. 502, it appears that Terrell executed a note in blank and delivered it to Scott, a director of a bank, to be filled up with the proper sum for the renewal of another of Terrell's notes held by the bank. The director filled up the note for a larger sum than the amount necessary for renewal, and, acting with the board of directors when the note was discounted, had it discounted for his own use. The Supreme Court of Alabama said:

"It cannot be admitted that in receiving the blank of the defendant to be used for his benefit Scott acted as the agent of the bank, and certainly he did not thus act in abusing the authority conferred on him by the defendant. But in filling up the blank for a larger amount than his authority required, and then offering the note for discount, he was in reality the representative of his own interest. Pro re nata, his powers as a director were suspended, he was contracting with the bank through his associates in the directory; he was borrowing, not lending, its money. Though a member of the board, and present too, it cannot be supposed that he co-operated with them in purchasing paper of which he was the avowed proprietor; and whether he did or not, it cannot be presumed that he made any disclosure which would prejudice his application for a loan."

This case was also referred to with evident approval in American Surety Company v. Pauly.

If, therefore, the Thomases be considered as having acted with the other three members of the discount committee, because of their presence at its meeting and the requirement of the by-law that the paper accepted by the committee should "receive the unanimous consent of all members present at the meeting before being entered," we nevertheless think that notice of the alleged fraud of the Thomases cannot be imputed to plaintiff.

There is another aspect of the case that should not be overlooked. The unanimous testimony of the four witnesses who were present at the meeting of the discount committee shows that the Thomases did not sit with the committee when its remaining three members considered their offer and decided what to do with it. They absented themselves from the conference and took no part in the decision. They seem to have studiously refrained from acting to any extent whatever as agents of the bank. They were not regarded by the other three members as so acting. The transaction, from beginning to end, was one in which they were acting, and were understood by the other members of the committee as acting, for themselves only. They were negotiating with the bank at arms' length in a transaction in which they were vendors and the bank a vendee. A rule of law which would impute notice to the bank in such a case would make it unsafe for any bank at any time to discount paper for, or purchase it from, one of its directors.

It is further contended by the defendant that the court erred in certain of its rulings on the admission and rejection of evidence. When Mr. Moore, one of the defendants, was under cross-examination, he was asked if, after the note had been delivered to the Thomases and he had begun to suspect fraud, he made any effort to recover possession of the note, and the question was allowed to stand because the court thought its answer might show whether Mr. Moore's conduct was consistent with his declaration that he suspected fraud. The court refused to allow the defendants to prove that the Thomases did not have the stock which they agreed to deliver to Coyle in their "strong box" in the bank, as they had declared, but that they had hypothecated it, and did not have possession or control of it. The defendants sought to prove the terms of a certain trust alleged to have been created by the Thomases for the benefit of their creditors, including the plaintiff in this case, and after a part of the testimony on this point had been taken the court struck it out, and refused to allow more, on the ground that, even if such trust were created, it did not relieve the defendants of their liability. The vice president of the bank was allowed to testify that certain checks drawn by E. R. Thomas against his account in the bank of the plaintiff, amounting to the sum of $50,500, were paid by the bank; he testifying from his knowledge of the course of business in the bank and from the signatures, indorsements, and stampings on the checks, and not from actual knowledge or recollection of such payments. Testimony was admitted explaining how the word "deliver" came to be inserted in the contract of October 5, 1907; the argument against its admission being to the effect that it was an attempt to vary a written agreement by parol testimony, while the exception taken at the trial was for a totally different reason, and the plaintiff was permitted to show that during the negotiations preceding the signing of the contract of October 5, 1907, by the Thomases and Coyle, Coyle admitted the interest of the other defendants in the contract. We find no error in any of these rulings.

Error is also assigned on the ground that the plaintiff alleges in the statement of its claim that it received the note in suit from Coyle, while the proofs show that it was received from one of the Thomases. This is not an objectionable variance. It is common practice for a plaintiff who holds a note indorsed in blank to declare on it as a note indorsed and delivered to the plaintiff by the indorser, regardless of the number of hands through which it may have passed after such indorsement, or of the person from whom it may have been actually received. Such pleading in no wise embarrasses the defense.

What has been said disposes of the most important of the 34 assignments of error. Each of the assignments has been carefully considered, but we find no reversible error in any of them. The judgment of the Circuit Court will therefore be affirmed, with costs.

NOTE.—The following is the opinion of Holland, District Judge, in the court below:

HOLLAND, District Judge. The plaintiff bank, being in possession of a note made by John J. Coyle and 15 other persons to Coyle as payee, and by him indorsed in blank, instituted suit against the makers in this court to

recover principal and interest. The plaintiff in its statement avers that it took the note before maturity from John J. Coyle, who then and there indorsed and delivered the said note. for value received, without notice to the plaintiff. At the trial the plaintiff offered the note, and it was admitted in evidence. After some other formal proof it rested its case. · The defense was that the note was not taken from John J. Coyle, "who then and there indorsed and delivered said note" to plaintiff bank, but that the note had been placed in the possession of one E. R. Thomas, president, and O. F. Thomas, director, of plaintiff bank, and by them delivered to the plaintiff.

This was not contradicted, and it is now claimed that, if the plaintiff took the note from the Thomases, there is such a variance between the allegata and probata as to entitle them to an arrest of judgment, or, under our Pennsylvania practice act, to a judgment non obstante veredicto. When the plaintiff rested its case, its proofs were in exact accord with its statement of claim, and the variance, if any, arose out of the facts established in the defense. There is no such variance here as would entitle the defendants either to an arrest of judgment or a judgment in their favor. The eminent Chief Justice Sharswood of Pennsylvania has passed upon this question in this wise: "The objection that the evidence varied from the allegations of the narr., in that it showed that the note sued on, which was indorsed in blank, was delivered to one Croft, who delivered it to the plaintiff, and not to the plaintiff directly, is of no force. · An indorsement in blank makes the note negotiable from hand to hand like money. The holder may place above it a special order to pay him, and strike out all subsequent names on the note, if there are any. If, indeed, he wishes to preserve his recourse against them, he must allege and prove their indorsement. Here, however, Croft's name was not on the note." Dilworth v. Hurst, 1 Phila. 206. This was embodied in the Pennsylvania negotiable instruments act by the Legislature of this state. It is the same in most of the states of the Union. Crawford's Negotiable Instrument Law, p. 59.

It is also urged that as the bank declared it had received the note directly from Coyle, and the evidence shows that it came into the possession of the bank through the Thomases, who were officers, that as a matter of law the plaintiff acknowledges the Thomases as its agents, and in law is bound by the knowledge its agents and officers had of the alleged defective title to the note. We do not think that the proof of the facts upon which this alleged variance is predicated changes the rule as to the knowledge of officers dealing with a bank in their own interest. That is to say, the undisclosed knowledge of an agent or officers of a bank dealing with it in their own antagonistic interest is not binding on the bank. The knowledge of the Thomases is not attributable to the bank, and if they, being officers, negotiated this note to the bank, as alleged by the plaintiff, without knowledge of any defect, before maturity, for value, their undisclosed knowledge of any defect would not be a defense. There are no other reasons why either judgment should be arrested or a judgment entered non obstante veredicto.

There are numerous reasons for a new trial, 18 original, and subsequently 26 additional were filed; the latter principally raising questions as to the admission of evidence. I have carefully examined the charge of the court, and the view I then took.I still think the correct one. Every conceivable meritorious and technical question was raised by the defense, and counsel, in their zeal, insisted upon the most liberal possible construction of the rules in submitting their evidence. There being a question of fraud involved, they were allowed a wide range, which resulted in the offer of much evidence which was in many instances entirely too remote and irrelevant, and it was upon the rulings of the court in these connections that nearly all of the reasons for a new trial based upon the action of the court on questions of evidence were based.

The two principal questions involved were: (1) Whether, as contended by the plaintiff, the note was delivered to the Thomases to be used by them to secure certain stocks with the proceeds, or, as contended by the defendants, that it was delivered to them to be held by them until they (the Thomases) had delivered these stocks to Coyle; and (2) if the note was placed in the possession of the Thomases with the latter condition attached, whether or not the

Thomas negotiated it to the bank with the latter's knowledge of the alleged defect in the title. These questions were submitted to the jury, we think, under proper instructions as to the law applicable to the facts and circumstances in the case.

The important questions now raised were before the court at the trial of the cause, and were fully considered in the charge. We do not, therefore, think it necessary to take up seriatim these same reasons now filed for a new trial. The question raised by the twelfth additional reason for a new trial is to the effect that the court erred in reading to the jury notice of special matter filed to correct an error in the affidavit of defense. The court referred to these affidavits, which were filed as part of the pleadings in the cause, not as evidence of what the agreement was between Coyle et al. and the Thomases, but for the purpose of enabling the jury to judge of the weight which they would give to the testimony of Coyle upon the subject. He was cross-examined as to the reason why he made these conflicting affidavits in the pleadings, and they were read to the jury for the purpose of refreshing their memory as to what they were, so that they could judge as to the credibility of the witness.

The real serious question in the case, in our judgment, is the one raised by the fifteenth additional reason for a new trial, and alleges error of the court in charging the jury as follows: "The fact that they presented it there, and went in one corner of the room, or about the room, or out of the room, or in the other room, while the other three decided on it, does not carry notice to the bank, as long as they took no part in deciding the question as to whether the paper was to be accepted. They could stand up in the room, and urge those other three men to take it, and to pass favorably upon it, and argue the reasons why, and assert that the men who made the paper were responsible men, and good men, and were able to pay it when it came 'due, and urge every other legitimate reason for the other three members to purchase the paper. So long as they took no part in determining the question as to whether the bank should take it or not, they were regarded as not taking part in the question of accepting the paper, and their knowledge of its defect would not be knowledge of the bank. When they came to the question of whether the bank should take it or not, if they participated in that act, then, gentlemen of the jury, that would vitiate the title of the bank to the paper."

Whether or not the court was at all in error in stating a rule as to the conduct of officers of the bank in negotiating with it in their own interest is a grave question. I, however, think we did not state the rule any stronger against the defendants than is justified by the authorities. A review of the defendants' evidence alone shows that upon their own story they were extremely careless in placing a note indorsed in blank, regular upon its face, for a large amount, in the possession of third parties, enabling them to fraudulently dispose of it, and they were, upon their own showing, entitled to no relaxation of the principle that, where one of two innocent parties must suffer by the fraud or wrong of a third party, the one who put it within the power of such third party to commit the fraud or wrong must bear the loss.

Failing to find any error either in the charge or rulings of the court, the defendants' motions in arrest of judgment and for a new trial must be overruled, and the request that judgment be entered non obstante veredicto be refused. It is so ordered.