## CZARLINSKY v. UNITED STATES.
### No. 500.

Circuit Court of Appeals, Tenth Circuit.
Dec. 21, 1931.

George E. Remley, of Raton, N. M., and A. T. Hannett, of Albuquerque, N. M., for appellant.

Hugh B. Woodward, U. S. Atty., of Albuquerque, N. M.

Before PHILLIPS and McDERMOTT, Circuit Judges, and POLLOCK, District Judge.

POLLOCK, District Judge.

Czarlinsky, hereinafter called defendant, was charged by indictment containing nine counts with violations of section 338, title 18, USCA. The first count of the indictment, omitting the formal parts, reads, as follows:

"At a Special July, 1930, Term thereof, held at Albuquerque, in the District of New Mexico.

"The Grand Jurors for the United States of America, duly empaneled, sworn and charged in the District Court of the United States, in and for the District of New Mexico, at the term and place aforesaid, and inquiring for said District, on their oath present that heretofore, 'to-wit, on the 9th day of April, A. D. 1928, at Raton, in the State and District of New Mexico, and within the jurisdiction of this court, Carl Czarlinsky, alias C. Czarlinsky, late of said district, knowingly, unlawfully, maliciously and feloniously did devise a scheme and artifice to defraud Alfred J. Lowe, a merchant, trading under the name 'Al. Lowe', engaged in the business of selling merchandise at wholesale at Ninth & Broadway Bldg., 834 S. Broadway, in the City of Los Angeles, in the State of California; that the scheme and artifice so devised was substantially this: that said Carl Czarlinsky, alias C. Czarlinsky, should obtain the shipment of merchandise to him on credit by means of false and fraudulent representations as to his financial worth, transmitted by United States mail in manner as follows, and on said date was carried into effect as follows:

"That said Carl Czarlinsky, alias C. Czarlinsky, was then the owner of a certain retail merchandise business, conducted under the name of 'The Style Shop', and was engaged in the business of selling women's apparel, millinery and furnishings at retail in the City of Raton, Colfax County, State of New Mexico; that said Carl Czarlinsky, alias C. Czarlinsky, for the purpose of inducing the said Al. Lowe to fill orders for merchandise and to ship said merchandise to him upon credit, did knowingly, unlawfully, willfully, feloniously and in furtherance of said scheme and artifice cause to be placed in an authorized depository for mail matter for the United States mails, within the District of New Mexico, a certain envelope with postage thereon fully prepaid, addressed to Al. Lowe, 834 S. Broadway, Los Angeles, California, to be sent and delivered by the Post Office establishment of the United States to the said Al. Lowe, which envelope contained a financial statement purporting to show the financial condition of the said 'The Style Shop' in words and figures as follows:

" 'Statement of The Style Shop, Raton, New Mexico.

" '1—24—1927.

| Merchandise on hand at market value | $ 8,332.27 |
|---|---|
| Fixtures all paid for | 2,799.18 |
| Cash in bank | 502.58 |
| Cash on hand | 141.28 |
| Accounts receivable | 2,781.12 |
| Total Assets | 14,556.43 |
| Accounts payable | 3,657.29 |
| Total Net Worth | 10,899.14 |
| Insurance on merchandise | 7,000.00 |
| Insurance on fixtures | 1,750.00 |
| Life Insurance payable to estate | 7,500.00 |

" '[Signed]   C. Czarlinsky.'

—which financial statement hereinabove set forth the said Carl Czarlinsky, alias C. Czarlinsky, then and there intended to be and knew to be false and fraudulent in this, to-wit: that the 'Accounts payable', due and owing by said Carl Czarlinsky, alias C. Czarlinsky, trading under the name 'The Style Shop' were then and there thousands of dollars in excess of the amount shown by such credit statement, the exact amount of such excess being to the Grand Jury unknown. * * *"

The other counts are the same, except that they charge different dates and different persons to be induced to sell and deliver merchandise on credit.

The defendant was found guilty and sentenced on each count, and has appealed.

Defendant was the owner and manager of a ladies' ready-to-wear store at Raton, N. M., doing business under the name of "The Style Shop." On June 13, 1928, defendant forwarded to the Minneapolis Linen Company, of Minneapolis, Minn., the credit statement, charged in count two of the indictment, in which he fixed his accounts payable at $3,-657.29 and his total net worth at $10,899.14. This statement was accompanied by a letter, which read as follows:

"Telephone 17-W

"The Style Shop, 136 South Second Street, Women's Ready-to-Wear, Millinery and Furnishings, Raton, New Mexico.
"6—13—1928.
"Minniapolis Linnen Co., Minneapolis, Minn.

"Dear Sirs: We have this day placed an order with your Mr. Stnley for 7 dozen bloomers and please ship same out as soon as possible and we are encloseng you our statement and hope same meets with your approval and will assure you that we will always discount your invoices very promptly and know that this will be the beginning of a very pleasant bsuiness relation ship.

"Thanking. you in advance for giving this your special and kind attention.

"Very truly yours,
"The Style Shop,
"C. Czarlinsky.

"CC/MG"

On the dates charged in the other eight counts of the indictment, he sent the same credit statement and substantially the same letter to the persons or firms named in such counts.

In June, 1925, L. S. Wilson, an attorney of Raton, began to get claims against defendant on account of merchandise purchased. When these claims were received, Wilson handed them to his secretary, who entered them in a claim register, gave them a number, and placed them in a file under that number. She then wrote a letter acknowledging the claim, and a letter to defendant demanding payment. These letters were forwarded to defendant in envelopes containing a return address card, and none of them were ever received back. In a few instances, defendant objected to certain claims, and upon investigation Wilson found that the objec-

tions were proper. Defendant made payments on such claims on an average of about once a week. On June 15, 1926, defendant delivered a letter to Wilson authorizing the latter to prorate such payments on all claims of creditors in Wilson's hands. When such payments were made, Wilson or his secretary entered them in his books. After having been properly identified by Wilson and his secretary, Irene Black, these books were offered in evidence. On April 9, 1928, according to such books, Wilson had in his hands for collection 409 claims against defendant on which there was a balance due of $19,711.-54. The number of claims and the amounts due gradually increased until October 12, 1928, when claim No. 501 was entered, and the balance due was $25,337.16.

An involuntary petition in bankruptcy was filed against defendant on December 14, 1928. On January 14, 1929, he was adjudged bankrupt. He filed a schedule in bankruptcy, showing a total indebtedness of $50,277.43. These schedules were offered in evidence at the trial.

The defendant introduced a motion to quash the indictment on the ground that there was no competent evidence before the grand jury showing that the financial statements referred to in the several counts were in fact false on the dates defendant was charged to have mailed them.

This motion came before the court for hearing on an agreed statement of facts as to the evidence before the grand jury on this particular point, and stipulation filed in this court. This stipulation shows that Wilson testified before the grand jury that early in 1925 he began to receive claims for collection against defendant; that such claims came from wholesale houses located in various parts of the United States and were for merchandise claimed to have been shipped to the Style Shop upon the order of defendant; that upon receipt of claims, Wilson's secretary gave such claims an office number and filed each in a file under such number; that she also entered it in a book, or collection docket, and upon receipt of such claim she acknowledged it, mailed a letter to defendant advising him of the claim and demanding payment; that such notice to defendant was sent in a properly stamped and addressed envelope bearing the return address of Wilson, and regularly deposited in the United States mail; that none of such letters were ever returned; that during the years 1926, 1927, and 1928 defendant called at the office of Wilson on an average of once a week and

made payments on such claims; that in a few instances defendant questioned certain claims, and upon investigation his objections were found to be correct; that other than a few instances referred to, defendant made no objections to such claims and made payments thereon, which Wilson distributed pro rata; that during the years 1926, 1927, and 1928 the balance due on such claims to which defendant had made no objection were many thousands of dollars in excess of $3,657.29; that after Wilson had testified, one Snyder was called, who qualified as an accountant; that he testified he had made an examination and audit of Wilson's books with particular reference to the number and amount of claims received by Wilson against defendant during the years 1926, 1927, and 1928, and the payments made thereon; that the amount of claims against defendant, as shown by the books on January 24, 1927, was largely in excess of $3,657.29, and had continuously increased thereafter; that the monthly balances in 1928 were several thousands of dollars in excess of $3,657.29; that certain creditors appeared before the grand jury and testified to claims against defendant aggregating $1,394.73.

The court overruled the motion, and such ruling is assigned as error.

■ The evidence of Wilson, in our opinion, was competent and established admissions by defendant showing the item of accounts payable in the several financial statements referred to in the several counts of the indictment was false. Furthermore, the falsity of the item of accounts payable was only a detail of the fraudulent scheme charged and necessarily the evidence with respect to this item was only a part of the evidence to show a fraudulent scheme. Defendant, at the hearing on this motion, did not establish that there was not other evidence tending to show that defendant devised the scheme charged. The statements and letters on their face had the earmarks of fraud. Defendant sent out the same identical statement showing cash in the bank, cash on hand, accounts receivable and accounts payable to the exact penny at different times between April 9, 1928, and October 12, 1928. It is apparent that these statements could not have been true. On a motion of this kind, it is not a question of whether there was sufficient evidence to establish such scheme, but whether there was any competent evidence whatever either of the crime charged or of some separate and distinct element thereof before the grand jury. If there was any evidence to show the defendant de-

vised such scheme, even if there was a want of evidence as to some detail thereof, the indictment is good. Brady v. U. S. (C. C. A.) 24 F.(2d) 405, 59 A. L. R. 563.

■ Defendant demurred to the indictment on the ground that it did not charge an offense, in that it did not allege, as a part of such scheme, that the defendant intended not to pay for such merchandise to be shipped to him on credit.

The statute makes it unlawful to devise a scheme to defraud or obtain money by means of false or fraudulent representations, and to use the mails for the purpose of executing such scheme. The indictment charged that the defendant devised a scheme to defraud by inducing the selling of a shipment of merchandise to him on credit by means of false representations as to his financial worth, particularly as to his accounts payable. Where one devises a scheme to induce another to sell merchandise to him on credit by means of false representations, he has devised a scheme to obtain property by means of false representations. If he uses the mails in a furtherance of such scheme, it comes within the statute. It is immaterial whether he intends some day to pay for the property. He obtains the property by the sale and delivery to him on credit by means of false representations. Scheinberg v. U. S. (C. C. A. 2) 213 F. 757, Ann. Cas. 1914D, 1258; Bettman v. U. S. (C. C. A. 6) 224 F. 819; Shaddy v. U. S. (C. C. A. 8) 30 F.(2d) 340.

■ Counsel for the defendant contend that the court erred in admitting the testimony of Wilson and Black, Wilson's books, and the testimony of the accountant as to what such books showed. This evidence was admissible, not as primary proof of the indebtedness, but as admissions by defendant as to the amount of his indebtedness to wholesale houses and the extent thereof. Defendant's counsel should not have objected to the admission of the evidence, but should have requested an instruction limiting the extent to which it should be considered by the jury.

Counsel for defendant also contend that the court erred in admitting the schedules in bankruptcy upon the ground that the effect was to compel defendant to give testimony against himself in a criminal case contrary to the Fifth Amendment. This, in our opinion, presents the only serious question in this case. Optner v. U. S. (C. C. A.) 13 F. (2d) 11, and Johnson v. U. S., 228 U. S. 457, 33 S. Ct. 572, 57 L. Ed. 919, 47 L. R. A. (N. S.) 263, seems to support the contention of the government. On the other hand, State v.

Drew, 110 Minn. 247, 124 N. W. 1091, 136 Am. St. Rep. 491, supports the contention of defendant.

█ It is our opinion that defendant, by filing the schedules in bankruptcy without objection, waived his privilege as to any use to which such schedules would be put, including evidence in a criminal prosecution. This proposition is supported by Ex parte Tracy (D. C. N. Y.) 177 F. 532; Levin v. U. S. (C. C. A. 9) 5 F.(2d) 598; Thompson v. U. S. (C. C. A. 7) 10 F.(2d) 781; Optner v. U. S., supra.

█ It appears that an involuntary proceeding in bankruptcy was filed against the defendant, and that he filed a schedule of indebtedness showing accounts payable in a sum of about ten times what his financial statement showed. It is objected that the schedules have to do with a period several months after the acts charged in the indictment. However, it was a small store, and we think it had some probative weight. The serious question is whether or not the introduction of such evidence was compelling the accused to give evidence against himself. Title 11, USCA § 25, imposes certain duties upon a bankrupt, such as attending the first meeting of the creditors, examining the proof of claims filed, executing such papers as may be necessary to transfer his property, and (8) to file schedules in bankruptcy, and (9) when present at the first meeting of his creditors, to submit to an examination concerning his affairs, "but no testimony given by him shall be offered in evidence against him in any criminal proceeding." We do not find that any punishment attends the failure to file the schedules. And from the standpoint of statutory construction, it would seem that Congress did not intend to say that the schedules should not be used in evidence. Section 25 imposes nine duties upon the bankrupt, and under the ninth alone, is the provision that testimony shall not be used against him. The Supreme Court of the United States in Ensign v. Pennsylvania, 227 U. S. 592, 33 S. Ct. 321, 57 L. Ed. 658, held that this provision did not apply to schedules.

█ We come then to the question of whether or not the use of such evidence is a violation of the Fifth Amendment, which requires that a witness shall not be compelled to give evidence against himself. We think the general rule undoubtedly is that if a defendant in a criminal case has testified in some other proceeding, such testimony may be used against him as an admission in a criminal case. Of course, a witness is always permitted to decline to testify on the ground that his testimony might incriminate him; if he fails to do that, and testifies, we understand that his admissions are available. The fact that he was not at that time charged with a crime is not material; he still could claim his privilege. In Burdick v. United States, 236 U. S. 79, 35 S. Ct. 267, 59 L. Ed. 476, the managing editor of the New York Tribune declines to testify before a grand jury on the ground that his answers might tend to incriminate him. He was not charged with a crime; and there seemed to be no probability that he ever would be; nevertheless the Supreme Court sustained him in his claim of the privilege, despite the fact that the President pardoned him from any crime that he might ever commit. We therefore think that the defendant in this case might have declined to file schedules on the ground that they might tend to incriminate him.

There are two cases squarely in point. One is Commonwealth of Pennsylvania v. Ensign, decided May 24, 1910, by the Supreme Court of Pennsylvania and reported in 228 Pa. 400, 77 A. 657 (affirmed 227 U. S. 592, 33 S. Ct. 321, 57 L. Ed. 658) which holds that the schedules are admissible. The other is State v. Drew, decided by the Supreme Court of Minnesota on February 25, 1910, and reported in 110 Minn. 247, 124 N. W. 1091, 136 Am. St. Rep. 491, which holds they are not admissible.

There seems to us to be considerable significance in the fact that formerly these schedules were prohibited by section 860 of the Revised Statutes, which read, as follows: "No pleading of a party, nor any discovery or evidence obtained from a party or witness by means of a judicial proceeding in this or any foreign country, shall be given in evidence, or in any manner used against him * * * in any court of the United States, in any criminal proceeding."

This statute was repealed on May 7, 1910 (36 Stat. 352).

We do not find any authority directly in point excepting the Pennsylvania case. The schedules were admitted by the Third circuit in Slakoff v. United States (C. C. A.) 8 F. (2d) 9, but there the only question raised was one of statutory construction; that is, whether the proviso in section 7 (9), 11 USCA § 25 (9) reached schedules. They were also admitted by the Sixth circuit in Optner v. United States (C. C. A.) 13 F. (2d) 11, 13, but the weight of the decision is impaired because no exception was made at the trial. The court did say, however, that

"this schedule was voluntarily filed by the bankrupt without any objection or claim on his part that it would tend to incriminate him, nor was any such claim made when it was offered in evidence. The provision of the Fifth Amendment confers a personal privilege upon the accused that he may waive and testify in his own behalf. Brown v. Walker, 161 U. S. 591, 597, 16 S. Ct. 644, 40 L. Ed. 819."

Incidentally, in two of these cases it was held that the fact that the schedules are several months later does not impair their competency, but goes only to their probative value. The same thing was held in Krotkiewicz v. United States, 19 F.(2d) 421 (C. C. A. 6).

The schedules were also admitted in evidence in the First circuit in Johnson v. United States (C. C. A.) 163 F. 30, 18 L. R. A. (N. S.) 1194, Justice Holmes writing the opinion. At that time, section 860 of the Revised Statutes was in force, but the objection to the schedules did not state the reason for the objection. Judge Holmes held that this statute was the only possible ground for the objection.

The District Court of the Southern District of New York in Re Kanter, 117 F. 356, comes close to it, for there the bankrupt declined to file schedules on the ground that the filing of them might tend to incriminate him. The court upheld his claim of privilege and said he need not file the schedules.

Another case that comes close is Arndstein v. McCarthy, 254 U. S. 71, 41 S. Ct. 26, 65 L. Ed. 138. That was an application for a writ of habeas corpus. It appeared that an involuntary bankrupt had declined to answer questions put by the referee on the ground that they might incriminate him. The lower court refused to grant the writ on the ground that the bankrupt had filed schedules without raising his constitutional privilege, and that therefore he could not refuse to answer questions concerning them. The Supreme Court held this was erroneous, and that the mere filing of the schedules did not constitute a waiver of his right to stop short whenever the bankrupt could fairly claim that the answer might tend to incriminate him. We think there is at least an intimation in this case that the privilege would apply also to the schedules.

In Johnson v. United States, 228 U. S. 457, 33 S. Ct. 572, 57 L. Ed. 919, 47 L. R. A. (N. S.) 263, the defendant was indicted for concealing money from his trustee in bankruptcy. On the trial of that case, the prosecution offered the defendant's books, which had been taken from him by the trustee in bankruptcy against his will. He then objected to the introduction of the books. The defendant objected to their use on the ground that they had been taken from him by force of law, and that the contents would incriminate him. The Supreme Court held that the books were admissible. It said that the books had been taken from him by force of law, but not for the purpose of obtaining criminal evidence against him, and said: "If the documentary confession comes to a third hand alio intuitu, as this did, the use of it in court does not compel the defendant to be a witness against himself."

In Wigmore's treatment of the question of self-incrimination, he states that the constitutional privilege applies to all sorts of trials, both investigations before the grand jury, and investigations by a Legislature. Wigmore on Evidence, § 2252.

It was also held by the First circuit in Johnson v. United States (C. C. A.) 163 F. 30, 18 L. R. A. (N. S.) 1194, that bankruptcy is a proceeding in court, and that the schedules were essentially a pleading in that case.

Irrespective of authority on the subject, we analyze the question as follows: The defendant could have invoked the protection of the Fifth Amendment at the time he filed his schedules. By failing to invoke the privilege at the time he filed the schedules he waived the constitutional immunity, just like a witness who has the privilege waives it by answering the question. Thereafter the schedules became admissions of fact, which are admissible against him, and he cannot object to their introduction on the ground that he could not have been compelled to have filed them.

Counsel for defendant finally contends that the court erred in that portion of the general charge with respect to intent. The objection to this instruction was general; it was coupled with a tendered instruction which incorrectly stated the law, in that it required the jury to find that the defendant intended to obtain the assignments of merchandise on credit and not to pay for the same. We have shown that the intention with respect to ultimate payment was immaterial in this case.

The case must be affirmed.