### UNITED STATES v. FELDMAN.

#### No. 180.

Circuit Court of Appeals, Second Circuit.

June 8, 1943.

Marshall, Bratter & Seligson, of New York City (Seymour M. Klein, of New York City, of counsel; Ruth F. Rosenthal and Harry L. Wechsler, both of New York City, on the brief), for appellant.

Mathias F. Correa, U. S. Atty., of New York City (Frederick H. Block, Peter J. Donoghue, and Thomas K. Fisher, Asst. U. S. Attys., all of New York City, of counsel), for appellee.

Before SWAN, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

SWAN, Circuit Judge.

The appellant was prosecuted upon an indictment of nine counts, each of which charged a scheme to defraud and a use of the mails in furtherance thereof, in violation of section 215 of the Criminal Code, 18 U.S.C.A. § 338. Seven of the counts were left to the jury. The appellant was found guilty on all of them and was sentenced to imprisonment for a term of five years.

■ The fraudulent scheme charged in the indictment was the "kiting" of checks. Such a scheme when the maker knows that he has no prospect of paying the checks and uses the mails in furtherance of his scheme is a violation of the mail fraud statute. Federman v. United States, 7 Cir., 36 F.2d 441, certiorari denied 281 U.S. 729, 50 S.Ct. 246, 74 L.Ed. 1146; United States v. Lowe, 7 Cir., 115 F.2d 596, certiorari denied 311 U.S. 717, 61 S.Ct. 441, 85 L.Ed. 466; see also Charles v. United States, 4 Cir., 213 F. 707, Ann.Cas.1914D, 1251.

■ The proof showed that in August, 1936, Feldman caused a small checking account to be opened in the name of "J. Feldman," his father, in a bank in Petoskey, Michigan. Then, operating in New York with blank checks signed by the father, he would fill in the amounts and the names of payees and would present the checks to various persons to be cashed, knowing that the funds on deposit were insufficient to meet the checks and that neither he nor his father had the financial means to pay them. During the first eight months of 1937 a mounting series of such checks were cashed, frequently by the Essex House, where Feldman rented an apartment. Knowing that it would take four or five days for the checks to be cleared through the Petoskey bank, he would present and cash additional checks and telegraph money to pay the checks previously issued. On August 20, 1937, when the managing director of the corporate owner of the Essex House learned of the check kiting, the J. Feldman account in the Petoskey bank had on deposit 24 cents, while the outstanding checks which Essex House had cashed between August 16 and 20, inclusive, totaled $30,700. During the period from January to August inclusive, the appellant had telegraphed to the Petoskey bank more than $860,000 to cover checks previously cashed. When confronted by the attorney for Essex House with a demand that he take care of the outstanding $30,700 of checks, he said that neither he nor his father could pay them. Nevertheless on August 21st he telephoned a young man named Reynolds, who mailed him a number of checks signed in blank drawn on Reynolds' account in a bank at Dayton, Ohio. Reynolds told the appellant that he had no money in the account and that the checks were not to be cashed unless the appellant sent the money to cover them. Disregarding this, the appellant filled in and cashed checks on Reynolds' account and thereby obtained the money to take up the outstanding Essex House checks. The fact that the latter were paid is no defense, since it is immaterial whether the unlawful scheme succeeds in actually defrauding an intended victim. Foster v. United States, 6 Cir., 178 F. 165; United States v. Rowe, 2 Cir., 56 F.2d 747, 749, certiorari denied 286 U.S. 554, 52 S.Ct. 579, 76 L.Ed. 1289; Baker v. United States, 8 Cir., 115 F.2d 533, certiorari denied 312 U.S. 692, 61 S.Ct. 711, 85 L.Ed. 1128, rehearing denied 312 U.S. 715, 61 S.Ct. 731, 85 L.Ed. 1145.

The Reynolds checks were protested. Thereupon Reynolds, accompanied by his fiancee, his mother and his mother's attorney, came to New York and interviewed Feldman, who told them he was "broke" and could not pay. Later he gave Mrs. Reynolds notes to cover the money she advanced to make her son's checks good, but these were never paid.

■ The mailings charged in the several counts of the indictment occurred in August, 1937. Two relate to checks cashed by Essex House, the other five to the Reynolds transaction. Nevertheless a very large part of the voluminous record consists of evidence concerning the appellant's resumption of kiting checks drawn on the J. Feldman account and cashed by Stout & Company between September, 1938, and April, 1939. There was also testimony as to transactions with Emanuel & Co. in 1930. Most of the errors in the conduct of the trial of which the appellant complains relate to these "similar transactions" which were relevant only on the issue of the appellant's fraudulent intent in the check kiting to which the mailings related. Why the government thought it necessary or desirable so greatly to lengthen the trial by the introduction of a mass of evidence relating to similar transactions we find difficult to understand in view of the completeness of its proof as to the Essex House and Reynolds transactions. Indeed the ap-

pellant's fraudulent intent was proved out of his own mouth by the introduction of testimony given by him in supplementary proceedings conducted by judgment creditors in courts of the State of New York. In these examinations he stated under oath that there were about 150 judgments against him representing an indebtedness of nearly $350,000; that he had no business and no source of income, was living on money borrowed from family and friends, and was contemplating bankruptcy. He even explained the precise scheme with which the indictment charged him, saying, "I am taking advantage of my father's credit by 'kiting' his checks, to pay off obligations I have incurred, and also meeting the checks I have used of his. * * * I cashed his checks from time to time, and wire the money to him to make the checks good that I have already cashed until such time as I can borrow the money to make good the last one," folio 4868. "He sends me blank checks signed. I use them as I see fit," folio 4870. " 'Kiting' as you mention it, and have been doing it for seven months. * * * I have no money," folio 4883. He also admitted tearing up Western Union receipts for money wired to his father, his purpose being "Not to have people know what I am doing," folio 4863. These excerpts are from examinations sworn to in July, 1937; that is, during the very period covered by the indictment. Several of them were stressed in the government's summation. With this evidence before the jury a verdict of guilt was inevitable.

The appellant did not take the stand to testify in his own behalf. He objected to the admission of his examinations in supplementary proceedings as a violation of his constitutional privilege under the Fifth Amendment not to be compelled to be a witness against himself. If the objection was well taken the judgment must be reversed; if it was not well taken the appellant's guilt is so clearly established that other alleged errors in the conduct of the trial may well be disregarded as nonprejudicial.

▮▮▮ Under the law of New York a judgment debtor can be compelled to give testimony concerning his affairs and cannot refuse to answer on the ground of self-incrimination since his testimony cannot be used against him in a state prosecution. N. Y. Civil Practice Act § 789 (formerly § 791); People v. Carlson, 222 App.Div. 54, 225 N.Y.S. 149. Although Feldman did not claim immunity under the Fifth Amendment on the ground that his answers might subject him to a federal prosecution, his counsel argues that such a claim could not have prevailed had it been made. Jack v. Kansas, 199 U.S. 372, 26 S.Ct. 73, 50 L.Ed. 234, 4 Ann.Cas. 689.[1] Consequently it is urged that the first opportunity Feldman had to claim his constitutional privilege was when his examinations in supplementary proceedings were offered in evidence, and he then did so. The argument assumes that the constitutional privilege operates to render inadmissible in a federal prosecution testimony given under a threat of judicial compulsion in litigation in a state court. No controlling authority has been cited for this proposition. Clark v. State, 68 Fla. 433, 67 So. 133, the only case relied upon by the appellant, presents the converse of the situation at bar. There testimony which the defendant had given in a bankruptcy proceeding was put in evidence against him in a state prosecution for embezzlement. Without discussion of the problem the opinion held this to be a violation of a provision in the state constitution which is the counterpart of the federal privilege under the Fifth Amendment. We are not convinced that this decision should control determination of the case at bar. In Johnson v. United States, 228 U.S. 457, 33 S.Ct. 572, 57 L.Ed. 919, 47 L.R.A.,N.S., 263, the defendant was convicted upon an indictment for concealing money from his trustee in bankruptcy. His books, title to which passed by operation of law to his trustee, were used against him. In affirming the conviction Mr. Justice Holmes remarked, "A party is privileged from producing the evidence, but not from its production." In United States v. Murdock, 284 U.S. 141, 52 S.Ct. 63, 76 L.Ed. 210, 82 A.L.R. 1376, the defendant was indicted for refusing to answer questions propounded by an internal revenue agent concerning deductions claimed in the defendant's income tax returns. His refusal was based on the claim that his answers might incriminate him under state law. In discussing his

[1] Similarly a witness compelled to testify under a federal statute cannot assert a privilege against self-incrimination under state law. Brown v. Walker, 161 U. S. 591, 16 S.Ct. 644, 40 L.Ed. 819; United States v. Murdock, 284 U.S. 141, 52 S. Ct. 63, 76 L.Ed. 210, 82 A.L.R. 1376.

claim of privilege the court said at page 149 of 284 U.S., at page 64 of 52 S.Ct., 76 L.Ed. 210, 82 A.L.R. 1376: "The English rule of evidence against compulsory self-incrimination, on which historically that contained in the Fifth Amendment rests, does not protect witnesses against disclosing offenses in violation of the laws of another country. King of the Two Sicilies v. Willcox, 7 St.Tr.(N.S.) 1050, 1068; Queen v. Boyes, 1 B. & S. 311, 330. This court has held that immunity against state prosecution is not essential to the validity of federal statutes declaring that a witness shall not be excused from giving evidence on the ground that it will incriminate him, and also that the lack of state power to give witnesses protection against federal prosecution does not defeat a state immunity statute. The principle established is that full and complete immunity against prosecution by the government compelling the witness to answer is equivalent to the protection furnished by the rule against compulsory self-incrimination. Counselman v. Hitchcock, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110; Brown v. Walker, 161 U.S. 591, 606, 16 S.Ct. 644, 40 L.Ed. 819; Jack v. Kansas, 199 U.S. 372, 381, 26 S.Ct. 73, 50 L.Ed. 234, 4 Ann.Cas. 689; Hale v. Henkel, 201 U.S. 43, 68, 26 S.Ct. 370, 50 L.Ed. 652. As appellee at the hearing did not invoke protection against federal prosecution, his plea is without merit and the government's demurrer should have been sustained."

Similarly, in Hale v. Henkel, 201 U.S. 43, at page 69, 26 S.Ct. 370, at page .376, 50 L.Ed. 652, the English rule was stated approvingly thus: " * * * the only danger to be considered is one arising within the same jurisdiction and under the same sovereignty." We are, therefore, of opinion that the testimony Feldman gave in the supplementary proceedings was competent evidence against him.

■ It seems surprising that neither the researches of counsel nor those of this court have uncovered any precise authority. The government contends that the question was passed upon by our decision in Vause v. United States, 2 Cir., 53 F.2d 346, 356, certiorari denied 284 U.S. 661, 52 S.Ct. 37, 76 L.Ed. 560. There the defendant Schuchman was cross-examined relative to testimony he had given in supplementary proceedings under § 791 of the New York Civil Practice Act. But that decision goes no further than to hold that such testimony may be used on cross-examination when the defendant under prosecution waives his privilege by taking the stand. Cf. Raffel v. United States, 271 U.S. 494, 497, 46 S.Ct. 566, 70 L.Ed. 1054; United States v. Buckner, 2 Cir., 108 F.2d 921, 929, certiorari denied 309 U.S. 669, 60 S.Ct. 613, 84 L.Ed. 1016; United States v. Mortimer, 2 Cir., 118 F.2d 266, 268, certiorari denied 314 U.S. 616, 62 S.Ct. 58, 86 L.Ed. 496. Possibly the absence of readily discoverable authority may be explained by the existence from 1868 until its repeal in 1910 of § 860 of the Revised Statutes. This provided: "No pleading of a party, nor any discovery or evidence obtained from a party or witness by means of a judicial proceeding in this or any foreign country, shall be given in evidence, or in any manner used against him or his property or estate, in any court of the United States, in any criminal proceeding, or for the enforcement of any penalty or forfeiture: Provided, That this section shall not exempt any party or witness from prosecution and punishment for perjury committed in discovering or testifying as aforesaid."

The fact that such a statute was thought necessary tends to support our conclusion that in the absence of a federal statute testimony obtained in litigation in a state court is competent evidence in a federal prosecution. See United States v. Hughes, Fed. Cas.No. 15,417, 12 Blatch. 553, 559; Czarlinsky v. United States, 10 Cir., 54 F.2d 889, 893, certiorari denied 285 U.S. 549, 52 S.Ct. 406, 76 L.Ed. 940; Johnson v. United States, 1 Cir., 163 F. 30, 32, 18 L.R.A.,N.S., 1194.

■ Moreover, even if the federal privilege against self-incrimination extended to compulsory testimony in state courts, the record here fails to show wherein the appellant suffered prejudice. The admissions sworn to in July, 1937 (excerpts from which appear above) were, of all his statements, both the most damaging in content and the closest in point of time to the mailings charged in the indictment. Yet these were plainly admissible, because the defendant could not have had a privilege in July against testifying as to a crime he did not commit until August, and because the federal authorities, by delaying the indictment till the statute of limitations had run on offenses committed prior to August

1937,[2] gave him the immunity against prosecution which has been held equivalent to the constitutional privilege. Brown v. Walker, 161 U.S. 591, 16 S.Ct. 644, 40 L.Ed. 819. See Hale v. Henkel, 201 U.S. 43, 67, 26 S.Ct. 370, 50 L.Ed. 652. Once there had been admitted these declarations that he had no funds and that he had kited checks, his much later statements of October, 1938, to September, 1939, became mere cumulative reiteration of matters already abundantly proved, and cannot have had any substantial effect on the jury's verdict.

■ Error is alleged in the admission of evidence concerning transactions with Emanuel & Co. in 1930. It is urged that these transactions were too remote in time and too dissimilar in character. Emanuel & Co. was a stock brokerage concern with which the appellant had an account and to which he gave a $50,000 draft drawn on one Heller who had neither any obligation nor any funds to meet it, as Feldman knew. We regard the transaction as sufficiently similar in character to be admissible on the issue of intent. See United States v. Seeman, 2 Cir., 115 F.2d 371, 373. But it was so remote in time that it might well have been excluded. However this is a matter in which the trial judge should be allowed a wide range of discretion. United States v. Shurtleff, 2 Cir., 43 F.2d 944, 948; Mayer v. People, 80 N.Y. 364, 373. With respect to a "similar transaction," the more remote it is in time, the less compelling is its probative value on the issue to be tried. Even if we were prepared to find error in the admission of evidence of transactions which occurred six years before the mail fraud charged in the indictment, we are not convinced that it was so prejudicial as to require a reversal of the judgment in a case where guilt was so clearly proved.

■ Complaint is also made with respect to restrictions upon the cross-examination of Goetz and Miller, partners of Stout & Company, who were called as witnesses by the prosecution. During some six months in 1938 and 1939 the appellant kited checks which were cashed either at the New York office or at the Florida office of Stout & Company. Goetz and Miller gave testimony tending to prove that they were victims of the appellant's misrepresentations as to his checks being good or his ability to make them good. The defense attempted to show that the partners gave accommodation to Feldman for business reasons, knowing that the funds in his bank account were insufficient to meet his checks. Stout & Company carried insurance which would have protected them against losses resulting from fraud of the sort charged against Feldman. On cross-examination his counsel attempted to inquire into prior statements, declarations and conduct of Goetz and Miller with reference to making a claim upon the insurance policies that were inconsistent with their testimony. The trial court's rulings prevented such inquiry. This was erroneous. Prior statements that the partners did not consider themselves to have been defrauded would have been inconsistent with the testimony that "in the beginning" they cashed Feldman's checks believing them to be good (fol. 2385). Such statements were admissible to discredit their testimony. Wigmore, Evidence, 3rd ed., § 1041; see Judson v. Fielding, 227 App.Div. 430, 237 N.Y.S. 348, affirmed 253 N.Y. 596, 171 N.E. 798; Pierce v. Sanden, 8 Cir., 29 F.2d 87, 90. Similarly, evidence as to their conduct with respect to the insurance investigation and claim was competent, for "a failure to assert a fact, when it would have been natural to assert it, amounts in effect to an assertion of the non-existence of the fact." Wigmore, Evidence, 3rd ed., § 1042; see Barrett v. New York C. & H. R. R. R. Co., 157 N.Y. 663, 670, 52 N.E. 659; Lilly v. Hamilton Bank, 3 Cir., 178 F. 53, 59, 29 L.R.A.,N.S., 558. But again we are satisfied that these errors could not have affected the jury's verdict.

We find no error in the charge. Other objections to the conduct of the trial are deemed too trifling to merit discussion. Indeed the defendant's guilt was so overwhelmingly established that only a most glaring error could be prejudicial.

Judgment affirmed.

CLARK, Circuit Judge (dissenting).

The present is one of those disturbing cases where the conduct of the defendant is most unattractive, to put it mildly; and yet there was real doubt whether he had defrauded his friends or merely imposed upon their good nature and willingness to help him as he wished. I feel I must say that, in my judgment, not only was guilt not overwhelming, but it was so doubtful that

─────

[2] The indictment was filed Aug. 20, 1940. The applicable limitation is three years. 18 U.S.C.A. § 582.

extreme care was needed to insure a fair trial, particularly in view of the natural prejudice which defendant's conduct tended to inspire. But that care was not exercised.

The defense centered on the point that the various persons who cashed the checks for defendant knew what he was, up to and assisted him knowingly. Although I agree that even on this issue there was sufficient evidence to take the case to the jury, my view as to the substantial character of the trial court's errors is necessarily influenced by my own conclusion that the affirmative evidence of knowledge was strong. Certainly agents of the Essex House had it, and the only question here is how far the higher-ups in that organization remained in ignorance notwithstanding the sizable amounts of these daily transactions. Again there can be no question but that Goetz and Miller had knowledge at some time while the practice continued; the only question is whether for a period one of them at least lacked it. Hence cross-examination of these witnesses as to their prior statements, declarations, and conduct was highly important and significant. Refusal to permit such examination was, therefore, clearly erroneous, as the opinion points out. In view of the importance of this evidence on the most vital issue of the case, I think this ruling alone would require reversal.

As to Reynolds, defendant appealed to him for checks signed in blank, in order to get out of the jam he was in, and Reynolds naively complied. What would he have sent the checks for except that they might be used to bolster defendant's shaky financial condition? Perhaps here, too, there was evidence for the jury, although it points more in the direction of a violation of agency instructions than an intent to defraud by mail. At any rate, the evidence being thus equivocal, errors in the trial become the more important.

Under all the circumstances, I would find error not only in the limitation of cross-examination of Goetz and Miller already referred to, but also in the action taken with respect to the other two matters particularly considered in the opinion, as well as in the conduct of the trial generally. The question of use in the federal courts of defendant's examination in the state sup-

plementary proceedings, absolutely privileged on a state prosecution, is, as the opinion shows, not settled. I believe, however, that Clark v. State, supra, states the better rule, unless we definitely wish to trap persons between the interstices of the overlapping state and federal sovereignties. Cases such as United States v. Murdock, supra, show merely that defendant could not have refused to answer in the state proceedings; they do not hold that the immunity promised him can be substantially nullified by the wide scope of the federal mail fraud and conspiracy statutes. In plain fact he was required to incriminate himself. And the justification thought to be obtained by delaying prosecution until the statute of limitations had run as to matter covered by a part of his examination seems to me beneath the dignity of a great government, indeed, not the maintaining of those "civilized standards of procedure and evidence" required by McNabb v. United States, 63 S.Ct. 608, 613, 87 L.Ed. ——.

As to the proof of the similar Emanuel transactions many years earlier, of course the admissibility of such evidence should generally be within the discretion of the trial court; but if I am correct that the case was so close on the showing of both an intent to defraud and a defrauding, then this long outdated evidence might well have been enough to turn the scales against defendant.

There were other details of the trial which I find disturbing, in view of this condition of the evidence. These included such matters as the different treatment of defense and prosecution counsel, the former being required to state his proposed testimony at length in chambers, to be there ruled out for the most part, while the latter was allowed to present his claims as usual in the courtroom before the jury; or the allowing of an inference against defendant for not calling Mrs. Reynolds' Florida lawyer to rebut a self-serving reference by her on the witness stand; or as to errors in the charge clearly made, though possibly corrected before the jury retired. Without rehearsing these in detail, I must express my fear that defendant was tried and convicted of general amoral conduct, rather than of specific intent to defraud by mail.